DIEMER & WEI, LLP
Kathryn S. Diemer, Esq.-SBN 133977
55 S. Market Street. Suite 1420
San Jose, California 95113
Tel: (408) 971-6270
E-mail: kdiemer@diemerwei.com

-AND-

KLINOWSKI DAMIANO LLP
Jason R. Klinowski, Esq. - asb-3856-t61s
(*pro hac vice forthcoming*)
P.O. Box 43404
Birmingham, Alabama 35243
Tel: (205) 644-8881
E-mail: jklinowski@aglawyer.com
**COUNSEL MELON CORP.**

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| MELON CORP., <br><br>       Plaintiff, <br><br> vs. <br><br> SILO TECHNOLOGIES, ASHTON BRAUN, and DOES 1 THROUGH 20, each individually, <br><br>       Defendants. | Civil Action No: <br><br> **DEMAND FOR JURY TRIAL** |

## <u>COMPLAINT</u>

For its complaint, the plaintiff respectfully states as follows:

| CIVIL COMPLAINT | Page 1 of 71 |
|---|---|

**THE PARTIES**

1.      Melon Corp. ("*Plaintiff*") is a Nevada corporation with its principal place of business located at 11500 S. Eastern Ave., Suite #150, Henderson, NV 89052.

2.      Plaintiff buys and sells wholesale quantities of perishable agricultural commodities (hereinafter "*Produce*") in both interstate and foreign commerce.

3.      Plaintiff trades in fresh fruit and vegetable commodities the United States Department of Agriculture ("*USDA*") expressly recognize as commodities covered under the provisions of the Perishable Agricultural Commodities Act, 1930, *as amended*, 7 U.S.C. §§ 499a-499t ("*PACA*").

4.      At all times relevant hereto, Plaintiff was engaged, directly or indirectly, in the business of purchasing and/or selling Produce in wholesale or jobbing quantities and, therefore, is a "dealer" of Produce as defined by PACA.

5.      At all times relevant hereto Plaintiff operated its business under a valid USDA issued PACA License, which the USDA has identified as License No.: 20220765.

6.   Defendants are:

    A. Silo Technologies, Inc. ("Silo"), is a Delaware corporation registered to do business in California with its principal place of business located at 149 New Montgomery St., San Francisco, CA 94105.  At all times relevant to this action:

        i.   Silo was and is owned and operated by Ashton Braun;

        ii.  Silo was and is the holder of PACA license number 20210463, which the USDA issued to Silo on or about February 11, 2021;

        iii. As a PACA licensee, Silo was and is a "dealer" of Produce as defined by PACA;

iv.   Silo was and is the holder of a Freight Broker License – U.S. DOT No. 3818098 / MC-01380558 – authorizing Silo to broker the interstate transport of, *inter alia*, fresh Produce, which the Federal Motor Carrier Safety Administration ("*FMCSA*") issued to Silo on or about November 7, 2023.

v.   Silo acted by and through its officers, managers, shareholders, and agents and otherwise participated in the tortious conduct or other wrongs set forth herein.

B.  Ashton M. Braun ("*Principal*"), upon information and belief, is a resident of and domiciled in the State of Nevada, and at all times relevant hereto:

i.   was and is the Chief Executive Officer of Silo;

ii.   was and is identified on Silo's PACA license as the sole "Reported Principal" of that entity; and

iii.   was and is in a position to exercise dominion and control over Silo and otherwise participated in the tortious conduct or other wrongs set forth herein.

C.  Does 1-20 ("*Does*"), and each of them, at all times relevant hereto:

i.   was the owner, agent, servant, and/or employee of the other defendants, and was acting at all times within the scope of his or her agency and with the knowledge and consent of each other, and;

ii.   acted jointly and in concert and conspired and agreed to do the things hereinafter specified, and each and all of the things hereinafter alleged to have been done by the defendants or any of them, were done as co-

| CIVIL COMPLAINT | Page 3 of 71 |

conspirators and thus, as agents for each other, as well as in their respective individual capacities to advance their own individual interests.

7.      Silo, Principal, and Does shall hereinafter be collectively referred to as the "Defendants."

8.      If and when appropriate, Plaintiff will amend this complaint or seek leave of Court to amend this complaint for the purpose of pleading the names and capacity of the presently unknown Doe defendants.

9.      At all times relevant hereto, Silo acted or failed to act by and through Principal and Does.

10.      As a PACA licensee and dealer of Produce, the acts, omissions, or failures of its Principal, employees, or agents constitute acts, omissions, or failures of Silo.

## JURISDICTION AND VENUE

11.      The District Court has subject matter jurisdiction over this civil action arising under 7 U.S.C. § 499e(b)(2) ("liability may be enforced by … suit in any court of competent jurisdiction….") and pursuant to 28 U.S.C. § 1331. Federal Question Jurisdiction, because this matter involves questions concerning the interpretation and application of federal statutes and regulations.

12.      The District Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1337 because PACA qualifies as an "Act of Congress regulating commerce" and several of Plaintiff's claims herein arise under 7 U.S.C. § 499e(b)(2), 7 U.S.C. § 499p, and 7 C.F.R. § 46 *et seq*.

13.     The Court has supplemental jurisdiction over Plaintiff's other claims pursuant to 28 U.S.C. § 1367(a).

14.     The Court has *in rem* jurisdiction over the Plaintiff's claims pursuant to, *inter alia*, 28 U.S.C. § 1655 because Defendants' designated bank and, therefore, its principal assets are located in San Jose, California.

15.     Venue in this district is based on 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district and a substantial part of the property that is the subject of this action is or was situated within this district.  Simply put, this matter arises in the San Jose Division of the Northern District of California, because a substantial part of the property which is the subject of the action is situated in Santa Clara County.

## NATURE OF THE CASE

16.     This is a civil action for monetary and injunctive relief, pursuant to which Plaintiff seeks to enforce its rights against the Defendants under both PACA's Trust and Unfair Conduct provisions and further seeks to enforce its rights under state law for the Defendants alleged conduct of operating as an unlicensed lender, breach of contract, breach of fiduciary duty, breach of trust, breach of duty of loyalty, and tortious interference with receipt of trust assets, etc.

17.     As set forth in detail herein, Plaintiff is a dealer of Produce under PACA and trustee of the statutory trust PACA imposes upon Plaintiff's assets for the benefit of its unpaid Produce suppliers.  Similarly, Silo is a dealer of Produce under PACA and co-trustee of the statutory trust PACA imposes upon Plaintiff's assets for the benefit of its unpaid Produce suppliers.

18.     Defendants have committed willful, repeated, and flagrant violations of Section 2 of PACA by dissipating Plaintiff's PACA trust assets.  Specifically, Defendants have knowingly diverted Plaintiff's PACA trust assets away from Plaintiff's unpaid suppliers of Produce (i.e., the

PACA trust beneficiaries) and to Silo. As a direct result of Silo's PACA violations, Defendants have knowingly and unlawfully diverted and wrongfully seized not less than $1,549,366.62 of Plaintiff's PACA trust assets. Defendants' unlawful conduct has critically impaired and precluded the ability of Plaintiff's unpaid sellers or suppliers of Produce to receive prompt payment from Plaintiff's PACA trust assets in violation of Section 2 of PACA.

19.     Further, by and through Silo's various unlicensed lending arrangements with Plaintiff, Defendants have placed themselves in a position to dominate and control Plaintiff's PACA trust assets (e.g., control over Plaintiff's bank accounts, control of Plaintiff's key financial records, payment authority to debit Plaintiff's bank account, and payment decision making authority). As such, Defendants are each co-trustees of Plaintiff's PACA trust assets and they are each, jointly and severally, liable to both Plaintiff and Plaintiff's PACA trust beneficiaries. Silo's brazen and ongoing dissipation and seizure of Plaintiff's PACA trust assets violates PACA and constitutes, *inter alia*, a breach of trust, a breach of loyalty, a breach of fiduciary duty, and tortious interference with Plaintiff's receipt of trust assets.

20.     Still further, Silo's negligent or reckless lending practices resulting its failure or refusal to fully and timely provide adequate funding to Plaintiff's melon crop. These failings caused and resulted in significant crop loss due to Plaintiff's inability to timely plant, pollinate, cultivate, harvest, pack, and ship Produce. On the farming side, Silo's failings resulted in significantly reduced commercial yields of Produce, lost sales revenue, loss of profits, and Plaintiff's loss of customer contracts and purchase orders. To mitigate the foregoing, Plaintiff purchased significant quantities of Produce on the open market to satisfy as many of its customer contracts as possible. These otherwise unnecessary outside Produce purchases severely impacted Plaintiff's cash flow and further contributed to the aggregate losses from the failed melon crop.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

21.    Silo was and is engaged in the business of providing supply chain financing and cash flow solutions to buyers, sellers, growers, and shippers of food, including Produce, in interstate and foreign commerce.

***Silo's Unlicensed Lending Operations***

22.    In furtherance of Silo's business, Silo provided commercial lending services to Plaintiff, and many others.

23.    Silo's loans to Plaintiff were for the agreed upon business purpose of supporting Plaintiff's melon farming project and to support the growth of Plaintiff's business operations.

24.    Silo's commercial lending services included, *inter alia*, a program wherein Silo would lend money to Plaintiff in exchange for Plaintiff's agreement to repay the principal amount of the loan, plus agreed upon interest and fees, by and through Plaintiff's Produce related accounts receivable.

25.    Silo secured its commercial loans to Plaintiff via taking a security interest in and to Plaintiff's PACA trust assets (e.g., Plaintiff's Produce related accounts receivable to its customers and all proceeds related to said Produce sales).

26.    Silo's commercial loans to Plaintiff were not secured by real property.

27.    Silo's commercial lending services operated in a manner similar to a "table lending" or "table funding" program wherein Silo would originate loans for which it did not have sufficient capital to fund.  Instead, Silo had a financial arrangement with other or larger lenders or investors to provide capital necessary to fund the loans Silo originated for the benefit of itself and the members of its "table lending" program.

28.     In furtherance of Silo's "table lending" program, Plaintiff applied for certain loans and cash advances through Silo and worked directly with Silo to address any and all due diligence that was necessary for Silo to prepare Plaintiff's loan application and related documents.

29.     Silo would communicate Plaintiff's loan details, along with the attendant risks and rewards, to its funding partners to secure funding for Plaintiff's loan(s).

30.     Upon information and belief, Silo's funding partners include or have included: First Citizens Bank & Trust Company; Jefferies Funds LLC, Initialized Capital Management LLC, Haystack Capital Partners, Tribe Capital, Andreessen Horowitz, Moore Capital Management LP, Collate Capital LLC, Koch Distributive Technologies, LLC and others.

31.     By and through Silo's "table lending" program, Silo appears to be the direct lender to Plaintiff and Silo maintains the lending relationship with Plaintiff and Silo is the public facing brand of the "table funding" program.

32.     By and through Silo's "table lending" program, Silo originates loans without having adequate capital on hand to fund said loans and leverages the resources of larger lenders participating in Silo's "table lending" program.

33.     By and through Silo's "table lending" program, Silo provided third party funds to Plaintiff that did not belong to Silo.

34.     Upon information and belief, Silo assigns its loans, such as the ones provided to Plaintiff herein, to those larger lenders or investors who provide, directly or indirectly, Silo the capital necessary to fund loans to Plaintiff and others.

35.     Upon information and belief, Silo assigns its loans to those larger lenders or investors who provided the capital necessary to fund the loan in a contemporaneous or back-to-back transaction.

36.     By and through Silo's "table lending" program, Silo originated loans for which it was not the real source of funding, but rather a type of intermediary.

37.     Silo's role in the "table lending" program includes negotiating the terms of the loan with borrowers, such as Plaintiff herein, working directly with borrowers to perform all due diligence appurtenant to the loan application, and otherwise preparing loan documents and gathering information requested by the members of Silo's "table lending" program.

38.     Silo acted as an agent for those undisclosed members or participants of Silo's "table lending" program.

39.     Silo acted as an agent for Plaintiff, and other borrowers, in connection with all loans Plaintiff received from Silo and those undisclosed members or participants of Silo's "table lending" program.

40.     Upon information and belief, Silo receives referral fees, payments, or other things of value from those undisclosed members or participants of Silo's "table lending" program in exchange for the origination or referral of loans.

41.     The State of California requires those engaged in the business of making loans or brokering loans to obtain and maintain a license from the California Department of Financial Protection & Innovation.

42.     Silo does not hold or maintain a license under California Financing Law to operate as a finance broker and, therefore, is not authorized to make or broker commercial loans.

43.     Silo does not hold or maintain a license under California Financing Law to operate as a finance lender and, therefore, is not authorized to make or broker commercial loans.

44.     Silo knew or should have known that it was required to obtain and maintain a finance lender and/or finance broker license under California Financing Law and knowingly and willfully failed to obtain said licensure.

45.     As detailed below, Silo structured its business and contracts in such a manner as to disguise or conceal the fact that it operated as the public facing member or participant of a "table lending" program targeting, *inter alia*, the fresh Produce industry.

**Silo's Unlicensed Commercial Banking Operations**

46.     Silo was and is also engaged in the business of providing commercial banking services to third parties (e.g., providing online bill pay services, deposit account maintenance, invoicing, financial reporting, etc.), such as Plaintiff herein;

47.     Silo's use of telecommunications devices, computer networks, and other digital technologies allowed Silo to transact business with Plaintiff within the State of Nevada via the Internet.

48.     Plaintiff utilized Silo's network as its primary accounting and banking platform.

49.     Plaintiff accessed and utilized Silo's network to view its accounts receivable and payable reports, to make payments to Produce and other vendors, to invoice its Produce customers, to record its receipt of payment, and to obtain other financial reports.

50.     Silo worked with Plaintiff in connection with Plaintiff's daily and weekly performance of its financial duties through Silo's network and Silo monitored, managed, and digitally stored Plaintiff's financial information.

51.     The State of California requires those engaged in the business of commercial banking (e.g., offering management consulting advice and services, engaging in lending activities,

providing online bill pay services, etc.) to obtain and maintain a license under the California Financial Code.

52.   Silo does not hold or maintain a license under California law to operate as a commercial bank and, therefore, is not authorized to engage in the commercial banking business.

53.   Silo knew or should have known that it was required to obtain and maintain a commercial bankers license under California law and knowingly and willfully failed to obtain said licensure.

54.   As detailed below, Silo structured its business and contracts in such a manner as to disguise or conceal the fact that it was engaged in the commercial banking business targeting, *inter alia*, the fresh Produce industry.

**Silo's Apparent Insolvency**

55.   At all times relevant hereto, Silo lacked the liquidity or free cash flow to singly or directly provide Plaintiff loans or cash advances utilizing its own funds.

56.   Upon information and belief, beginning in January of 2024, Silo lacked adequate capitalization to operate under the parties written lending agreements, which providing ongoing lending or cash advance obligations on the part of Silo, and was unable to sustain any losses resulting from its inability to collect upon its own accounts receivable or loan debt to third parties.

57.   In April of 2024, Silo provided Plaintiff with multiple e-mail notices regarding "an expected situation that has temporarily affected our banking system" and similar statements regarding Silo's inability to access or provide funding to its customers.

58.   In May of 2024, TechCrunch published an online article that reported that Silo had difficultly collecting a loan from one of its customers and this caused Silo's bank to pause the loan product.

59.     In May of 2024, Silo provided Plaintiff with multiple e-mail notices regarding the "unexpected disruption in our ability to provide funding" and stated that "we would encourage you to seek out other MCA and/or factoring companies if you are in need of funding in the short term."

60.     Principal improperly shifted the risk of Silo's undercapitalization or bad debt risk to Plaintiff and Silo's other Produce customers.

61.     Upon information and belief, beginning in the first quarter of 2024, Silo was insolvent.

62.     Upon information and belief, beginning in the first quarter of 2024, Silo's liabilities exceeded its assets.

63.     Upon information and belief, Principal possessed actual and constructive knowledge of Silo's insolvency.

64.     Potentially linked to its actual or imminent insolvency, Silo laid off approximately two dozen people (roughly 30% of its staff) across the company in May of 2024, but publicly stated that the workforce reduction was done to "preserve runway for the company."

## COUNT I

## ENFORCEMENT OF THE PACA TRUST

### SILO

65.     Plaintiff re-alleges, adopts, and incorporates Paragraphs 1-10 and Paragraphs 21-64 of this Complaint as though restated here in full.

66.     Plaintiff owes a duty to its PACA trust beneficiaries to use reasonable care to prevent Silo, as a co-trustee of the PACA trust, from committing a breach of trust and to compel Silo to redress its breach of trust.  Restat. 2d of Trust, § 184.

67.     Silo was and is in possession, custody and control of Plaintiff's PACA trust assets, including, without limitation: (i) Plaintiff's Produce related accounts receivable; (ii) proceeds from Plaintiff's sale of Produce; (iii) cash; (v) any other assets commingled with the proceeds of Plaintiff's sale of Produce; and (vi) other assets acquired or maintained with such proceeds, cash, assets, or other trust assets held in Plaintiff's name (collectively the "*PACA Trust Assets*") for the benefit of Plaintiff's PACA trust beneficiaries.

68.     As a PACA licensee, Plaintiff served as the corporate trustee of its PACA Trust Assets.

69.     Silo was and is in a position to control Plaintiff's PACA Trust Assets and, therefore, is a co-trustee of said PACA Trust Assets.

70.     Silo exercised exclusive control over the bank account Silo directed Plaintiff to identify on the face of its invoices to its Produce customers regarding payment remittance for said Produce transactions.

71.     Silo jointly controlled Plaintiff's operating account where Plaintiff received payment from those Produce customers who did not remit payment directly to the Silo owned and controlled bank account.

72.     Silo's joint control over Plaintiff's operating account in Nevada included its written authorization to initiate the electronic transfer of money via an "automated clearing house (ACH) or direct electronic funds transfer" from Plaintiff's operating account.

73.     By and through its control over Plaintiff's bank accounts, Silo received or seized and collected the proceeds of Plaintiff's Produce sales.

74.     Silo controlled or was in a position to control the way Plaintiff paid its suppliers, including its Produce suppliers, by and through, *inter alia*, its requirement that Plaintiff utilize its on-line network as its primary accounting and banking software.

75.     Plaintiff accessed and utilized Silo's network to create and view its accounts receivable and payable reports, to make payments to Produce and other vendors, to invoice its Produce customers, to record its receipt of payment, and to obtain other financial reports.

76.     Silo controlled or was in a position to control Plaintiff's bank accounts and its access to cash.

77.     Silo monitored, managed, and digitally stored Plaintiff's financial information and, thereby, knew or should have known that Plaintiff's PACA trust beneficiaries were not being promptly paid.

78.     Silo's position of control over Plaintiff included a blanket lien in all of Plaintiff's receivables, restrictions on Plaintiff's ability to incur debt beyond normal trade debt, receipt of recurring financial data, and the imposition of multiple representations, warranties, and covenants that effectively controlled Plaintiff's operations.

79.     Silo's position of control over Plaintiff also included the ability to control Plaintiff's cash flow by operation of the Instant Pay Program contract (defined below) and the Future Receivables Sale and Merchant Cash Advance Agreement (defined below).

80.     Silo's position of control over Plaintiff's cash flow made the Plaintiff dependent on Silo for its continued viability and ability to operate as an ongoing concern.

81.     Silo exercised its position of control over Plaintiff to influence Plaintiff's operations, including its PACA Trust Assets.

82. Silo failed to exercise its position of control over Plaintiff to ensure Plaintiff's compliance with PACA, including the timely payment of Plaintiff's Produce suppliers.

83. As a person[1] in a position of control over Plaintiff and/or Plaintiff's PACA Trust Assets, Silo served as a co-trustee of the PACA Trust Assets.

84. As corporate trustees of the PACA Trust Assets, Plaintiff and Silo each possess a duty to preserve the PACA Trust Assets and to protect the PACA Trust Assets from dissipation.

85. Silo breached its duty to preserve the PACA Trust Assets and to protect the PACA Trust Assets from dissipation by receiving, collecting, and otherwise seizing not less than $1,549,366.62 of Plaintiff's PACA Trust Assets for its sole benefit.

86. Given Silo's position of both control over and visibility into Plaintiff's finances, Silo knew or should have known that its receipt and retention of $1,549,366.62 of PACA Trust Assets from Plaintiff would preclude Plaintiff's ability to promptly pay its unpaid Produce suppliers and severely impair the ability of Plaintiff's PACA trust beneficiaries to receive payment from Plaintiff's PACA Trust Assets.

87. By taking not less than $1,549,366.62 of Plaintiff's PACA Trust Assets for its sole benefit, Silo failed to preserve sufficient amounts of the PACA Trust Assets to fully satisfy all of Plaintiff's unpaid Produce suppliers.

88. By taking not less than $1,549,366.62 of Plaintiff's PACA Trust Assets for its sole benefit, Silo failed to ensure that Plaintiff's PACA Trust Assets were freely available to satisfy its outstanding obligations to Plaintiff's PACA trust beneficiaries.

---

[1] "The term 'person' includes individuals, partnerships, corporations, and associations." 7 U.S.C. § 499a(b)(1); See also Silo's Future Receivables Sale & Merchant Cash Advance Agreement (defining a "person" to mean "an individual, a corporation, a partnership, limited liability company, associates, trust, unincorporated organization, or other legal entity or organization, or a government body.")

89.     Silo failed to voluntarily cease and refrain from receiving, collecting, and seizing Plaintiff's PACA Trust Assets while Plaintiff was unable to pay its Produce related transaction debts when they became due.

90.     As a direct result of Silo's failure to properly protect Plaintiff's PACA Trust Assets from dissipation, the Plaintiff has suffered damages which are covered under the PACA trust in an amount not less than $1,549,366.62.

91.     As a co-trustee of the PACA trust, Plaintiff is under a duty to compel Silo to redress its breach of trust. As a result, Plaintiff further seeks the entry of an Order directing the Defendants to immediately turn over to the Registry of the Court all assets impressed with the PACA trust for the benefit of all Plaintiff's unpaid trust beneficiaries, thereby creating a fund or reconstituting the PACA trust for the benefit of said trust beneficiaries.

WHEREFORE, Plaintiffs respectfully request this Court enter Judgment against Defendants and in favor of Plaintiff determining that Defendants violated their obligations under PACA, as described above, and awarding Plaintiff an amount of damages to be proven at trial, but not less than $1,549,366.62. Plaintiff further respectfully requests whatever additional relief, under law or equity, that this Court shall determine to be just and proper.

## COUNT II

### PACA VIOLATION: FAILURE TO MAINTAIN TRUST

### SILO & PRINCIPAL

92.     Plaintiff re-alleges, adopts, and incorporates Paragraphs 1-10 and Paragraphs 21-91 of this Complaint as though restated here in full.

93.     Plaintiff and Silo entered into a series of written and oral contracts involving Silo's provisioning of certain loans and cash advances to Plaintiff, all of which were secured by Plaintiff's PACA Trust Assets.

94.     Via oral and written agreement entered into on or about January 4, 2024, Silo agreed to loan or otherwise advance Plaintiff $6,573,300.00 to fund both Plaintiff's Summer 2024 California Melon Crop and its Spring 2024 Arizona Melon Crop (collectively the "*2024 Melon Crop*").

95.     In connection with Silo's agreement to fund Plaintiff's 2024 Melon Crop, Silo approved the written budget for the 2024 Melon Crop.

96.     Of the $6,573,300.00 approved loan amount, Silo only loaned or advanced Plaintiff $4,837,861.15, which was $1,735,438.85 less than the agreed amount.

97.     In May of 2024, Silo provided Plaintiff with multiple e-mail notices regarding the "unexpected disruption in our ability to provide funding" and stated that "we would encourage you to seek out other MCA[2] and/or factoring companies if you are in need of funding in the short term."

98.     Despite Silo's agreement to loan or advance funds to Plaintiff for the 2024 Melon Crop, Silo lacked the liquidity or free cash flow to provide Plaintiff with the full amount of the funds needed for Plaintiff's melon farming needs.

99.     Silo further lacked the liquidity or free cash flow to provide Plaintiff with the funds needed for Plaintiff's 2024 Melon Crop in a timely manner.

100.    Silo's inability to fully and timely fund Plaintiff's 2024 Melon Crop resulted in a significant crop loss that caused Plaintiff to purchase Produce from third party suppliers to satisfy Plaintiff's contractual obligations to its Produce customers.

---

[2] MCA means that certain Merchant Cash Advance agreement between Silo and Plaintiff.

101.    Because Plaintiff purchased Produce from third party suppliers to supplement its 2024 Melon Crop, Plaintiff's PACA Trust Assets were neither sufficient nor freely available to satisfy its outstanding obligations to both Silo and its PACA trust beneficiaries.

102.    Because Plaintiff's PACA Trust Assets were neither sufficient nor freely available to satisfy its outstanding obligations to its PACA trust beneficiaries, Silo and Plaintiff, as co-trustees of the PACA trust, each possessed a duty to preserve Plaintiff's PACA Trust Assets exclusively for its PACA trust beneficiaries.

103.    Silo knew or should have known that Plaintiff purchased Produce from third party suppliers to supplement its 2024 Melon Crop and to satisfy its contractual obligations to its Produce customers.

104.    In addition to written and oral communications between the parties, Silo's actual or constructive knowledge that Plaintiff purchased Produce from third party suppliers originated from Plaintiff's use of Silo's online network as its primary banking and accounting software to record vendor invoices, pay vendor invoices, generate customer invoices, record payments from customers, and generate its accounts payable and receivables aging reports.

105.    Silo, as a co-trustee of the PACA trust, possessed a duty of inquiry to confirm that Plaintiff's PACA Trust Assets were sufficient and freely available to satisfy its outstanding obligations to its PACA trust beneficiaries before Silo seized or took Plaintiff's PACA Trust Assets for its own use and benefit.

106.    Plaintiff repeatedly objected – orally and in writing – to Silo's receipt, seizure, and retention of its PACA Trust Assets and demanded Silo to return funds and pay Plaintiff's growers.

107.    On December 22, 2023, Gurdeep Billian of Plaintiff e-mailed Jeff Butler of Silo and notified him that "we have over $300K in berry sales for December, this is outside grower fruit sales…" and "these growers will need to get paid very soon."

108.    On April 22, 2024, Gurdeep Billan of Plaintiff emailed Jeff Butler of Silo and notified him that Silo had collected or otherwise received $730,289.74 from January 1, 2024 through April 22, 2024, and that "99% of this product was purchased from outside growers." This same e-mail requested Silo to release not less than $355,212.66 to Plaintiff so it could pay its outside growers.

109.    Despite Plaintiff's aforementioned examples of written notice and demand, Silo refused to release the PACA Trust Assets back to Plaintiff and continued to receive and collect not less than an additional $202,966.91 of Produce receivables and related proceeds between April 22, 2024 and May 23, 2024.

110.    Silo received or seized and retained Plaintiff's PACA Trust Assets directly from Plaintiff's Produce customers and through direct ACH or electronic fund withdrawals from Plaintiff's bank account while Plaintiff's Produce suppliers remained unpaid.

111.    Silo's receipt or seizure and retention of Plaintiff's PACA Trust Assets from Plaintiff's Produce customers and via direct ACH or electronic fund withdrawals from Plaintiff's bank account while Plaintiff's Produce suppliers remained unpaid is inconsistent with Silo's obligation as a co-trustee to maintain Plaintiff's PACA Trust Assets such that they are both sufficient and freely available to satisfy Plaintiff's obligations to its Produce suppliers.

112.    Silo's receipt or seizure and retention of Plaintiff's PACA Trust Assets from Plaintiff's Produce customers and via direct ACH or electronic fund withdrawals from Plaintiff's

bank account while Plaintiff's Produce suppliers remained unpaid is inconsistent with its obligation as a co-trustee to protect Plaintiff's PACA Trust Assets from dissipation.

113.    Principal authorized or approved Silo's receipt or seizure and retention of Plaintiff's PACA Trust Assets from Plaintiff's Produce customers and via direct ACH or electronic fund withdrawals from Plaintiff's bank account while Plaintiff's Produce suppliers remained unpaid.

114.    Principal failed to object or otherwise act to prevent Silo's receipt or seizure and retention of Plaintiff's PACA Trust Assets from Plaintiff's Produce customers and via direct ACH or electronic fund withdrawals from Plaintiff's bank account while Plaintiff's Produce suppliers remained unpaid.

115.    As a direct result of the Defendants' aforementioned actions and inactions, Plaintiff has incurred damages in an amount not less than $1,549,366.62.

WHEREFORE, Plaintiffs respectfully request this Court enter Judgment against Defendants and in favor of Plaintiff determining that Defendants violated their obligations under PACA, as described above, and awarding Plaintiff an amount of damages to be proven at trial, but not less than $1,549,366.62. Plaintiff further respectfully requests whatever additional relief, under law or equity, that this Court shall determine to be just and proper.

## COUNT III

## CONVERSION AND UNLAWFUL RETENTION OF PACA TRUST ASSETS

## SILO

116.    Plaintiff re-alleges, adopts, and incorporates Paragraphs 1-10 and Paragraphs 21-115 of this Complaint as though restated here in full.

117.    On or about June 3, 2022, Plaintiff entered into a "Supplier Receivable Sales Agreement," referred to by Silo and Plaintiff as the "*Instant Pay Program*," with Silo in order to

obtain financing based upon, *inter alia*, certain of Plaintiff's PACA Trust Assets (the "*Instant Pay Contract*").

118.   On or about January 5, 2024, Plaintiff executes the first of six Cash Advance Program Order Forms, thereby entering into Silo's unsigned and misidentified Future Receivables Sale & Merchant Cash Advance Agreement, which was incorporated into the signed Cash Advance Program Order Forms by a misidentified[3] reference (the "*Cash Advance Agreement*" or "*MCA*").

119.   The Instant Pay Contract and the Cash Advance Agreement each defined the terms upon which Silo would lend Defendants sums certain on a secured basis with Silo retaining a security interest in and to Plaintiff's PACA Trust Assets, which expressly includes Plaintiff's Produce receivables and all related proceeds.

120.   Silo loaned or otherwise advanced funds to Plaintiff pursuant to the terms of both the Instant Pay Contract and the Cash Advance Agreement together.

121.   Despite the presence of integration clause language in both the Instant Pay Contract and the Cash Advance Agreement, Silo modified the terms of its Instant Pay Contract with Plaintiff to aid in the recovery or collection of funds allegedly due to Silo under the terms of its Cash Advance Agreement.

122.   On or about January 4, 2024, Silo modified the terms of its Instant Pay Contract with Plaintiff by adjusting the funding formula to reflect a loan or advance to Plaintiff in an amount equal to fifty percent (50%) of the value of Plaintiff's Produce transaction invoice to its customer.

---

[3] Each of Silo's documents titled "Cash Advance Program Order Form" included an internal reference and hyperlink to a document identified therein as the "Master Service Agreement." The hyperlink to the Master Service Agreement takes the reader to a Google document cloud storage site where an unsigned document titled "Future Receivables Sale & Merchant Cash Advance Agreement" can be found. Given the misidentification of the document, it is unclear what document was originally incorporated or linked to the signed Cash Advance Program Order Form documents, if any.

123.    The stated purpose of Silo's modification to the terms of its Instant Pay Contract with Plaintiff was to get Plaintiff caught up on a Cash Advance Agreement loan from October of 2023 for $1,000,000.00 (i.e., a balance forward debt from Plaintiff's 2023 farming operations).

124.    With respect to both the Instant Pay Contract and the Cash Advance Agreement, Plaintiff continued to bear all or substantially all the risk of non-recovery on its accounts receivable, which were hypothecated to Silo as collateral for certain loans and cash advances.

125.    At the time Plaintiff and Silo entered into the Instant Pay Contract and the Cash Advance Agreement, Silo knew Plaintiff was engaged in the business of purchasing and selling Produce.

126.    At the time Plaintiff and Silo entered into the Instant Pay Contract and the Cash Advance Agreement, Silo knew Plaintiff derived all or substantially all of its revenues from the sale of Produce.

127.    Upon entering into the Instant Pay Contract, Silo requested and received Plaintiff's financial documentation that showed Plaintiff's Produce suppliers or vendors and its Produce customer.

128.    Silo received Plaintiff's financial documentation by and through its network or accounting platform because Plaintiff utilized Silo's network as its primary accounting platform, which included its accounts receivable, accounts payables, and all relevant financial reporting functions.

129.    Throughout the term of the Instant Pay Contract and the Cash Advance Agreement, Silo received and otherwise had access to Plaintiff's accounts payable aging statement, which showed Plaintiff owed significant sums of money to its unpaid Produce suppliers that exceeded thirty, sixty, and ninety days or more.

130.     During the term of the Instant Pay Contract and the Cash Advance Agreement, Plaintiff was obligated to and did provide Silo with ongoing access to its financial documents, banking information, and provided additional financial reports on a regular basis.

131.     During the term of the Instant Pay Contract and the Cash Advance Agreement, Plaintiff was obligated to and did utilize Silo as its primary accounting software platform, which provided Silo with daily access to detailed information regarding Plaintiff's finances and the identity of its suppliers and customers.

132.     At all times relevant hereto, Plaintiff's monthly accounts payable aging statement and other financial documents was available to Silo and demonstrated that Plaintiff owed significant sums of money to its unpaid Produce suppliers that exceeded thirty, sixty, and ninety days or more.

133.     Throughout the term of the Instant Pay Contract and the Cash Advance Agreement, Plaintiff lacked the ability to pay its Produce suppliers promptly and in full.

134.     During the term of the Instant Pay Contract and the Cash Advance Agreement, Plaintiff's PACA Trust Assets were encumbered by Silo.

135.     During the term of the Instant Pay Contract and the Cash Advance Agreement, Silo possessed a secured interest in and to Plaintiff's PACA Trust Assets, including, but not limited to, all of Plaintiff's non-real estate assets, accounts receivable, deposit accounts, inventory, equipment, vehicles, and the proceeds of the same.

136.     During the term of the Instant Pay Contract and the Cash Advance Agreement, Plaintiff's PACA Trust Assets served as collateral for Silo's loans and advances to Plaintiff.

137.     Silo perfected its secured interest in and to Plaintiff's PACA Trust Assets by filing a UCC Financing Statement with Nevada's Secretary of State.

138.    Silo exercised its rights as a secured creditor of Plaintiff under the Instant Pay Contract and the Cash Advance Agreement to foreclose upon, or otherwise seize control of, all or substantially all cash, accounts receivable, reserve account funds, and other rights to payment held in the name of Plaintiff.

139.    At the time Silo received or seized Plaintiff's PACA Trust Assets, Silo knew or should have known Plaintiff's cash, accounts receivable, reserve account funds, and other assets were derived from Plaintiff's sale and transfer of  Produce.

140.    At the time Silo received or seized Plaintiff's PACA Trust Assets, Silo knew or should have known Plaintiff had outstanding accounts payable due to its Produce suppliers and sellers.

141.    Silo has collected, received, and seized Plaintiff's accounts receivable and other assets which Plaintiff generated through its transactions in Produce.

142.    Silo continues to seize and hold funds and assets Plaintiff generated through its transactions in Produce.

143.    Silo is in possession of certain assets it received or seized from Plaintiff and Plaintiff's account debtors which were impressed with the PACA trust.

144.    The assets Silo received from Plaintiff and Plaintiff's account debtors are PACA Trust Assets and rightfully belong to Plaintiff, as the corporate trustee of the PACA trust, and Plaintiff's unpaid suppliers of Produce, as beneficiaries of the PACA trust.

145.    Plaintiff's PACA Trust Assets are not assets of Plaintiff and are not available to satisfy any debts or obligations of Plaintiff while Plaintiff's Produce suppliers and vendors remain unpaid.

146.    Silo's receipt, possession, and retention of the PACA Trust Assets rightfully belong to Plaintiff, as corporate trustee of the PACA trust, and Plaintiff's unpaid Produce suppliers, as beneficiaries of the PACA trust, is a violation of PACA and the regulations promulgated thereunder.

147.    Silo received or otherwise seized Plaintiff's PACA Trust Assets while possessing actual or constructive knowledge of the fact that Plaintiff's PACA trust was in a deficient condition.

148.    Silo did not receive Plaintiff's PACA Trust Assets for value because, *inter alia*, Silo failed to lend or advance Plaintiff a commercially reasonable amount considering the value of the underlying invoices used to secure Silo's loans to Plaintiff.

149.    Throughout the term of the Instant Pay Contract, Silo received or otherwise took a security interest in and to 78 specific invoices from Plaintiff to Plaintiff's customers.

150.    Every loan or advance from Silo to Plaintiff was based upon Silo's preapproval of the customer whom Plaintiff invoiced and the value of each invoice.  As such, Silo provided Plaintiff with a series of not less than 78 separate loans, each secured in whole or in part by specific invoices.

151.    Of these 78 invoices, Silo loaned or advanced Plaintiff less than 80% of the face value on approximately 30% of said invoices.

152.    On December 22, 2023, Jeff Butler of Silo emailed Gurdeep Billan of Plaintiff to discuss Silo's election to reduce the amount Silo was willing to loan or advance Plaintiff based on the value of the underlying invoices used to secure Silo's loans to Plaintiff.  In this e-mail, Silo informed Plaintiff that it intended to reduce the amount it was willing to loan or advance to Plaintiff

on Plaintiff's invoices to Silo approved customers in order to get "your outstanding balance on both melon programs paid off."

153.    On December 22, 2023, Gurdeep Billian of Plaintiff e-mailed Jeff Butler of Silo and notified him that "we have over $300K in berry sales for December, this is outside grower fruit sales…" and "these growers will need to get paid very soon."

154.    Silo knowing and intentionally reduced the amount it was willing to loan or advance to Plaintiff on Plaintiff's invoices to recover an antecedent debt Plaintiff allegedly owed Silo and it did so with actual or constructive knowledge of the fact that Plaintiff possessed a duty or obligation to pay its Produce suppliers and that Silo's further restriction of Plaintiff's cash flow would impair Plaintiff's ability to promptly pay its Produce suppliers.

155.    Throughout the term of the Instant Pay Contract, Silo compelled Plaintiff to direct all its customer payments to a Silo owned or controlled bank account, which Plaintiff complied with by modifying its invoices to include payment instructions directing payment to the Silo owned or controlled bank account.

156.    Pursuant to the terms of Silo's Instant Pay Contract, Silo compelled Plaintiff to designate and use a single account for its receipt of payments from its Produce customers.

157.    Pursuant to the terms of Silo's Instant Pay Contract, Plaintiff utilized a single bank account containing all funds or revenue in a single commingled bank account and Silo had direct access to this account via ACH or electronic fund transfer payment authority.

158.    Pursuant to the terms of Silo's Instant Pay Contract, Plaintiff could not modify the payment instructions to its customers without Silo's written approval.

159.    Silo's Instant Pay Contract did not provide for the transfer of slow payment or non-payment risk from Plaintiff to Silo.

CIVIL COMPLAINT

160.    Silo's Instant Pay Contract penalized Plaintiff if its account debtors failed to timely remit payment on Plaintiff's invoices to Silo.

161.    Silo's Instant Pay Contract compelled Plaintiff to immediately turnover or otherwise transfer to Silo any funds Plaintiff may have received from its account debtors.

162.    Silo's Instant Pay Contract obligated Plaintiff to fully pay or reimburse Silo for all amounts Silo was unable to collect from Plaintiff's account debtors.

163.    Silo receipt and possession of Plaintiff's PACA Trust Assets pursuant to the terms of the Instant Pay Contract was not the result of a true sale.

164.    Plaintiff transferred, pledged, or otherwise hypothecated its PACA Trust Assets to Silo, pursuant to the terms of the Instant Pay Contract and the Cash Advance Agreement, to serve as collateral or security for a financing arrangement with Silo.

165.    Silo's receipt and possession of the PACA Trust Assets pursuant to the terms of the Instant Pay Contract and the Cash Advance Agreement was not the result of a true sale because Silo filed a UCC financing statement to perfect its security interest in and to said PACA Trust Assets.

166.    Silo received PACA Trust Assets while having actual or constructive knowledge of the fact that Plaintiff purchased Produce from third party suppliers prior to and throughout the term of the Instant Pay Contract and the Cash Advance Agreement.

167.    Throughout the term of the Instant Pay Contract, Silo was directly or indirectly responsible for paying Plaintiff's venders, including its Produce suppliers.

168.    Beginning on or about September 23, 2022, Plaintiff would access Silo's network or accounting platform to pay its vendors, including its Produce suppliers, by and through Silo's

direct link to Plaintiff's operating account and Silo's accounting platform would produce an e-mail confirmation of payment to Plaintiff.

169.   On April 22, 2024, Gurdeep Billan of Plaintiff emailed Jeff Butler of Silo and notified him that Silo had collected or otherwise received $730,289.74 from January 1, 2024 through April 22, 2024, and that "99% of this product was purchased from outside growers."  This same e-mail requested Silo to release not less than $355,212.66 to Plaintiff so it could pay its outside growers.

170.   Despite Plaintiff's written notice, Silo refused to release the PACA Trust Assets back to Plaintiff and continued to receive and collect not less than an additional $202,966.91 of Produce receivables and related proceeds between April 22, 2024 and May 23, 2024.

171.   As of the filing date of this pleading, Silo has failed or otherwise refused to return the PACA Trust Assets it received from Plaintiff's customers, which made it impossible for Plaintiff to promptly pay its PACA trust beneficiaries.

172.   The involuntary transfer of Plaintiff's PACA Trust Assets to Silo and its subsequent failure to return these funds to the proper beneficiaries of the PACA trust require the imposition of prejudgment interest to prevent it from reaping any benefit from its unauthorized receipt or seizure of said trust funds.

173.   Silo's receipt and possession of the PACA Trust Assets rightfully belonging to Plaintiff's PACA trust beneficiaries, while Plaintiff's Produce suppliers remain unpaid, is a violation of the PACA and the regulations promulgated thereunder.

174.   Silo's unjust receipt and possession of the PACA Trust Assets rightfully belonging to Plaintiff's unpaid Produce suppliers resulted in the dissipation of Plaintiff's PACA Trust Assets.

Silo's receipt of assets impressed with Plaintiff's PACA trust *res* has resulted in damages to Plaintiff in the current amount of not less than $864,867.52, plus further interest.

WHEREFORE, Plaintiffs respectfully request this Court enter Judgment against Defendants and in favor of Plaintiff determining that Defendants violated their obligations under PACA, as described above, and awarding Plaintiff an amount of damages to be proven at trial, but not less than $864,867.52. Plaintiff further respectfully requests whatever additional relief, under law or equity, that this Court shall determine to be just and proper.

## COUNT IV

### BREACH OF TRUST AND FIDUCIARY DUTY OF LOYALTY BY CO-TRUSTEE OF THE PACA TRUST

### SILO

175.    Plaintiff re-alleges, adopts, and incorporates Paragraphs 1-10 and Paragraphs 21-174 of this Complaint as though restated here in full.

176.    On or about June 3, 2022, Plaintiff engaged in the business of buying and selling Produce in interstate and foreign commerce as a PACA licensed dealer.

177.    All or substantially all of Plaintiff's revenue is generated from its dealings in Produce.

178.    In addition to its own melon farming operations, Plaintiff buys wholesale quantities of Produce from third parties for resale to its customers across the country.

179.    Almost all of Plaintiff's Produce suppliers comply with the trust provisions of PACA and preserve their status as a properly perfected PACA trust beneficiary in and to Plaintiff's PACA Trust Assets.

180.    Plaintiff's obligations under PACA's trust provisions begin upon its receipt and acceptance of Produce from its suppliers as early as June 3, 2022.

181.    Plaintiff's obligations under PACA continue throughout the life of company until Plaintiff makes full payment to its suppliers for the Produce.

182.    Plaintiff's obligations under PACA continue throughout the life of the company in that new beneficiaries are created every time Plaintiff receives and accepts Produce from a supplier and other beneficiaries are satisfied via full and prompt payment from Plaintiff's PACA Trust Assets.

183.    Once Plaintiff receives and accepts, directly or indirectly, delivery of Produce from its suppliers, PACA imposes a duty upon Plaintiff to maintain its PACA Trust Assets in a manner that insures they are both sufficient in amount and freely available to make full payment promptly to its PACA trust beneficiaries.

184.    As a PACA licensee, Silo possesses actual or constructive knowledge of PACA and its requirements, duties, and obligations.

185.    Because Silo was and is in a position to control Plaintiff, Silo was and is a co-trustee of Plaintiff's PACA Trust Assets.

186.    As a co-trustee of Plaintiff's PACA Trust Assets, Silo owed both Plaintiff and Plaintiff's PACA trust beneficiaries a fiduciary duty to maintain Plaintiff's PACA Trust Assets in a manner that insures they are both sufficient in amount and freely available to make full payment promptly to its PACA trust beneficiaries.

187.    Silo breached its fiduciary duty of trust and loyalty to Plaintiff and Plaintiff's PACA trust beneficiaries when Silo received or seized or took Plaintiff's PACA Trust Assets for its own use and benefit with actual or constructive knowledge that Plaintiff's Produce suppliers remained unpaid.

188.     Silo breached its fiduciary duty of trust and loyalty to Plaintiff and Plaintiff's PACA trust beneficiaries when Silo received or seized or took Plaintiff's PACA Trust Assets for its own use and, thereby, misappropriated Plaintiff's PACA Trust Assets.

189.     Silo breached its fiduciary duty of loyalty to Plaintiff and Plaintiff's PACA trust beneficiaries by engaging in self-dealing by and through, *inter alia*, Silo's receipt or seizure and retention of Plaintiff's PACA Trust Assets for its sole benefit and for the purpose of satisfying Plaintiff's obligations to Silo ahead of Plaintiff's obligations to its PACA trust beneficiaries.

190.     Silo breached its fiduciary duty of loyalty to Plaintiff and Plaintiff's PACA trust beneficiaries when Silo ignored Plaintiff's notice to Silo regarding the need to pay Plaintiff's Produce suppliers with its limited resources and Silo continued to receive or seize and retain Plaintiff's PACA Trust Assets for its own use and benefit.

191.     Silo breached its fiduciary duty of loyalty to Plaintiff and Plaintiff's PACA trust beneficiaries when Silo failed or refused to return Plaintiff's PACA Trust Assets to Plaintiff or Plaintiff's PACA trust beneficiaries.

192.     Silo's knowingly and willfully breached its fiduciary duty to Plaintiff and Plaintiff's PACA trust beneficiaries because it received and ignored Plaintiff's notice regarding the need to pay Plaintiff's Produce suppliers and Plaintiff's financial information (e.g., accounts payable reports) identifying all such Produce suppliers and the amounts owed to each.

193.     As a direct result of Silo's wrongful conduct and breaches of its fiduciary duties of trust and loyalty to Plaintiff and Plaintiff's PACA trust beneficiaries, Plaintiff's PACA Trust Assets have been dissipated and are no longer sufficient in amount or freely available to promptly pay Plaintiff's PACA trust beneficiaries.

194.    As a direct result of Silo's wrongful conduct and breaches of its fiduciary duties of trust and loyalty to Plaintiff and Plaintiff's PACA trust beneficiaries, Plaintiff's PACA Trust Assets are currently unable to pay not less than $864,867.52, plus further interest and fees, to the PACA trust beneficiaries.

195.    Silo's breach of its fiduciary duties to Plaintiff and Plaintiff's PACA trust beneficiaries has resulted in damages to Plaintiff in the current amount of not less than $864,867.52, plus further interest.

WHEREFORE, Plaintiffs respectfully request this Court enter Judgment against Defendants and in favor of Plaintiff determining that Defendants violated their obligations under PACA, breached their trust obligations, and breached their fiduciary duties to Plaintiff, as described above, and awarding Plaintiff an amount of damages to be proven at trial, but not less than $864,867.52. Plaintiff further respectfully requests whatever additional relief, under law or equity, that this Court shall determine to be just and proper.

## COUNT V

## OPERATING WITHOUT A LICENSE: NEV. REV. STAT. ANN. § 604A

### SILO

196.    Plaintiff re-alleges, adopts, and incorporates Paragraphs 1-10 and Paragraphs 21-64 of this Complaint as though restated here in full.

197.    On or about June 3, 2022, Plaintiff entered into a "Supplier Receivable Sales Agreement," referred to by Silo and Plaintiff as the "*Instant Pay Program*," with Silo in order to obtain financing secured with, *inter alia*, Plaintiff's PACA Trust Assets.

198.    The Instant Pay Contract defined the terms and formula upon which Silo would loan or advance money to Plaintiff.

199.   Silo loaned or otherwise advanced no less than $869,448.07 to Plaintiff in a series of 78 or more separate transactions pursuant to the terms of its Instant Pay Contract and related documents and communications between the parties.

200.   Silo's series of loans or advances to Plaintiff were each provided to Plaintiff pursuant to the terms of its Instant Pay Contract and related documents and communications between the parties (e.g., communications modifying said contract).

201.   As a signatory to Silo's Instant Pay Contract and a recipient of not less than $869,448.07 of loan proceeds or cash advances from Silo across not less than 78 separate transactions valued at $1,131,096.04, Plaintiff was a customer of Silo and Silo recognized Plaintiff as a "customer" in multiple written communications to Plaintiff.

202.   Silo qualifies as a "person" because Silo is a corporation that, as a PACA licensee, operates subject to the PACA and the regulations promulgated thereunder.  To this end, PACA defines a "person" to include "individuals, partnerships, corporations, and associations."  7 U.S.C. § 499a(b)(1).

203.   Plaintiff qualifies as a "person" because Plaintiff is a corporation that, as a PACA licensee, operates subject to the PACA and the regulations promulgated thereunder.  To this end, PACA defines a "person" to include "individuals, partnerships, corporations, and associations."  7 U.S.C. § 499a(b)(1).

204.   The Instant Pay Contract defined the terms upon which Silo retaining a security interest in and to Plaintiff's PACA Trust Assets, which expressly include Plaintiff's Produce receivables and all related proceeds.

205.    Silo's Instant Pay Contract defined the terms upon which Plaintiff would repay Silo, including the transaction fees, costs, and penalties associated with Plaintiff's repayment obligations.

206.    Silo's Instant Pay Contract required Plaintiff to identify a bank account that it discloses to Silo and designates in writing to Silo as the account for Silo to use to recover any amounts Plaintiff may owe Silo under the parties' contracts (the "*Operating Account*").

207.    Silo's Instant Pay Contract further established a Silo owned and controlled bank account to be used by Plaintiff's account debtors to pay Plaintiff's invoices directly to Silo (the "*Payment Account*").

208.    Pursuant to Silo's Instant Pay Contract and at Silo's direction, Plaintiff did in fact establish Silo's Payment Account at Bridge Bank in San Jose, California as the "remit to" account for Plaintiff's account debtors.

209.    Silo directed Plaintiff to utilize the Payment Account at Bridge Bank in San Jose, CA to because Silo utilized Bridge Bank at the time the parties entered the Instant Pay Contract.

210.    Silo provided certain of Plaintiff's customers (e.g., Costco) with written notice of its financial relationship with Plaintiff and described the Payment Account by stating that Plaintiff "has authorized Silo Technologies, Inc. [sic] process collections and perform reconciliation services on its behalf and utilize a centralized bank account and mailing address to receive digital and physical payments respectively."

211.    On or about December 11, 2023, Silo moved its banking operations from Bridge Bank to JP Morgan Chase, which required updates to Plaintiff's invoices and notice to Plaintiff's account debtors regarding changes to its "remit to" or transaction payment information.

212.    Throughout the term of the Instant Pay Contract, Plaintiff worked with Silo to ensure that Plaintiff's invoices – issued to Plaintiff's customers by and through Silo's online or cloud-based accounting program/system – identified the Payment Account as the "remit to" information on each invoice and otherwise notified its customers of Silo's involvement with its bank accounts.

213.    Silo's Instant Pay Contract provided Silo with written authorization to initiate the electronic transfer of money via an "automated clearing house (ACH) or direct electronic funds transfer" from Plaintiff's Operating Account.

214.    Silo's Instant Pay Contract also obligated Plaintiff to transfer into the Payment Account any payment it may receive directly from an account debtor that did not send payment directly to the Silo controlled Payment Account.

215.    Silo's Instant Pay Contract provided that if Plaintiff failed to "cause Collections – defined therein as all payments made on any Purchased Receivable [] to Silo's Payment Account, in the ordinary course – to be deposited into Silo's Payment Account when required…" was a breach of the Instant Pay Program contract.

216.    Silo's Instant Pay Contract provided Silo with the written authority to transfer the full amount or face value of each of Plaintiff's invoices to its account debtors from Plaintiff's Operating Account and all other amounts Plaintiff may owe Silo, including "legal or collection fees" and "interest on such amounts at the maximum rate permitted under law."

217.    Silo's Instant Pay Contract also provided Silo with the written authority to transfer the full amount or the net face value of each of Plaintiff's invoices to its account debtors from Plaintiff's Operating Account regardless of whether Plaintiff's account debtors paid Plaintiff's

invoice or whether the funds Silo withdrew from Plaintiff's Operating Account were related to an invoice Silo used to calculate and secure any loan or advance Silo made to Plaintiff.

218.     Silo's Instant Pay Contract identified the payment due date – stated on the face of each of Plaintiff's invoices to its account debtors – as the "Maturity Date" by which Silo must be repaid the full amount of the loan or advance to Plaintiff based on Plaintiff's invoice to its account debtors.

219.     Silo's Instant Pay Contract operated as a deferred deposit loan because, after the Maturity Date identified on each of Plaintiff's invoices to its account debtors, Silo was automatically authorized to receive loan repayment amounts from Plaintiff's account debtors into its Payment Account or otherwise transfer said loan repayment amounts from Plaintiff's Operating Account without further notice or demand to Plaintiff.

220.     Throughout the term of the Instant Pay Contract, Silo both received payment from Plaintiff's account debtors into its Payment Account and electronically transferred payments out of Plaintiff's Operating Account.

221.     Silo's Instant Pay Contract penalized Plaintiff in the form of late fees if Plaintiff's account debtors failed to timely pay the full amount or the net face value of Plaintiff's invoices into the Payment Account on or before the "Maturity Date."

222.     Because Silo's Instant Pay Contract gave Silo the right to impose: (i) late fees upon Plaintiff without an end date; (ii) its legal or collection fees, and (iii) interest charges on all unpaid amounts upon Plaintiff, Silo assumed no risk of slow payment or non-payment of Plaintiff's invoices to its account debtors.

223.     Silo's Instant Pay Contract authorized Silo – in order to collect upon any funds Plaintiff owed to Silo – to initiate, without further notice or demand to Plaintiff, an ACH or other

electronic transfer funds or money from the Operating Account and any other bank account linked to Silo or other payment method on file with Silo.

224.    Pursuant to the terms of the Instant Pay Contract, Silo agreed not to receive payment from Plaintiff's account debtors or to execute an electronic transfer of money from the Operating Account to repay a loan or advance on a given invoice prior to the Maturity Date of the invoice used to calculate said loan or advance.

225.    Silo received, collected, or otherwise seized no less than $1,549,366.62 of Plaintiff's PACA Trust Assets from Plaintiff's Operating Account or directly from Plaintiff's account debtors via the Payment Account, which exceeded the $1,131,096.04 value of the 78 invoices by $418,279.58.

226.    Plaintiff fully performed its duties and obligations to Silo under the Instant Pay Contract and owes no further or additional duties or obligations to Silo thereunder.

227.    Neither Silo nor Plaintiff have operated or transacted together under the terms and conditions of the Instant Pay Contract since May of 2024.

228.    The State of California requires those engaged in the business of making loans or brokering loans to obtain and maintain a license from the California Department of Financial Protection & Innovation.

229.    Silo does not hold or maintain a license under California Financing Law to operate as a finance broker and, therefore, is not authorized to make or broker commercial loans.

230.    Silo does not hold or maintain a license under California Financing Law to operate as a finance lender and, therefore, is not authorized to make or broker commercial loans.

231.    Silo knew or should have known that it was required to obtain and maintain a finance lender and/or finance broker license under California Financing Law and knowingly and willfully failed to obtain said licensure.

232.    Silo transacted business with Plaintiff through the Internet in that Silo provided loans and advances to Plaintiff in Nevada by and through the parties' use of telecommunications devices, computer networks, and other digital technologies that allowed Silo to transact business within the State of Nevada.

233.    Plaintiff executed the Instant Pay Contract with Silo digitally through DocuSign from within the State of Nevada.

234.    The State of Nevada requires those engaged in the business of making loans or brokering loans to obtain and maintain a license from the State of Nevada and those businesses engaged in the business or making deferred deposit loans must obtain a license under Nevada Revised Statutes Chapter 604A.

235.    Silo does not hold or maintain a license under Nevada Law to operate as a lender and, therefore, is not authorized to make or broker commercial loans.

236.    Silo knew or should have known that it was required to obtain and maintain a lender license under Nevada Law and knowingly and willfully failed to obtain said licensure.

237.    Nevada Revised Statutes Chapter 604A prohibits such practices as lending without a license and accepting collateral or security from borrowers.

238.    Silo violated Nevada law by engaging in unlicensed lending, by having electronic control over Plaintiff's operating account, and accepting collateral and security from Plaintiff in connection with its lending practices.

239.   As a result of Silo's unlicensed, and therefore unlawful, lending practices, Silo's Instant Pay Program contract is void and unenforceable.

240.   As a result of Silo's unlicensed, and therefore unlawful, lending practices, Silo's Instant Pay Program contract is voidable by Plaintiff.

241.   In January of 2024 and through the May of 2024, Silo included by reference in its Cash Advance Grower Order Forms the documented identified as the Merchant Cash Advance Agreement, or "MCA."

242.   Plaintiff executed the Instant Pay Contract with Silo digitally through DocuSign and other e-sign programs from within the State of Nevada.

243.   Through the MCA, Silo loaned funds into the State of Nevada.

244.   Through the MCA, Silo received payments owed to Plaintiff, as the PACA Trustee, in the state of Nevada.

245.   Pursuant to the MCA, Silo had as much or more control of Plaintiff's Operating Account in Nevada as Silo had under the Instant Pay Agreement.

246.   Specifically, The MCA states at §5.1: "Data Access. Seller authorizes Silo to access and use any Customer Data to verify and confirm receipt by Seller of the Receivables, to aid in calculating the Estimated Periodic Remittance and facilitating its remittance, and otherwise ensure that Seller is in compliance with this Agreement. Seller agrees to link its Bank Account to the Platform such that Bank Account transaction data shall constitute Customer Data. Seller agrees not to take any action to limit Silo's access to or reduce the extent of the Customer Data." The MCA additionally states that "Seller represents and warrants that it owns the Bank Account and is authorized to access, debit, and **provide authorization to Silo to debit the Bank Account**;"

[MCA, §6.b], emphasis added. The MCA required, and Plaintiff provided, access for Silo to electronically control funds from Plaintiff's Operating Account.

247.   Silo again violated Nevada law by engaging in unlicensed lending, requiring electronic control of Plaintiffs' Operating Account, and requiring and accepting collateral and security from Plaintiff in connection with its lending practices, under the MCA.

248.   As a result of Silo's unlicensed, and therefore unlawful, lending practices, Silo's MCA contract violates the Nevada Statute.

249.   As a result of Silo's unlicensed, and therefore unlawful, lending practices under the Instant Pay Agreement and MCA, Silo has injured Plaintiff, causing Plaintiff's injuries through crop loss, lost sales, cover costs, and PACA related obligations.

WHEREFORE, Plaintiff respectfully seeks a judgment for Defendant's violations of Nevada Statute § 604A, et. cet., and for an award of damages thereunder seeks the statutory remedy of "(a) Actual and consequential damages; (b) Punitive damages; (c) Reasonable attorney's fees and costs; and (d) Any other legal or equitable relief that the court deems appropriate," under Nev. Rev. Stat. Ann. § 604A.930 (2023), in an amount to be determined at trial, but not less than $**3,320,730.00**, with such other and further amounts to be proven at trial.

Plaintiff next, under the statute pursuant to Nev. Rev. Stat. Ann. § 604A.930(d) (2023)(legal and equitable relief), respectfully moves the Court for entry of an **Injunctive Order** prohibiting Defendant from distributing, disgorging, or in any way using misappropriated PACA Trust Funds, so as to protect those third-party PACA beneficiaries whose PACA funds have been misappropriated and improperly retained by Defendant Silo.

Finally, Plaintiff respectfully seeks a judgment against Defendant for each instance when Defendant violated any part of Nevada Statute § 604A, et. cet., and a statutory award of damages

for each violation whereby Silo is liable for a statutory penalty of $1000 for each violation, provided under Nev. Rev. Stat. Ann. § 604A.930 (2023). While the exact number of Silo's statutory violations is yet unknown to the Plaintiff and will be proven at trial, the number of violations known to Plaintiffs for improper loan transactions made is equal to or greater than eighty-four (84) between the Instant Pay Contract and Cash Advance Agreements, and the number of times that Silo made an improper electronic appropriation of Melon Corp.'s funds from its bank account is no less than fourteen (14) times. Therefore, Plaintiff respectfully seeks a damages award of not less than **ninety-eight thousand dollars ($98,000)** for Defendant's statutory violations of Nevada Statute § 604A, et. cet. Plaintiff further prays for whatever additional relief, under law or equity, that this Court shall determine to be just and proper.

**COUNT VI**

**<u>BREACH OF CONTRACT</u>**

**COMPANY**

250.     Plaintiff re-alleges paragraphs 1 through 10 and 21 through 64 as though fully set forth herein.

251.     On or about January 4, 2024, Plaintiff and Silo met via Zoom call to discuss a budget for the entire 2024 Melon Crop.

252.     Gurdeep Billian of Plaintiff and Jeff Butler of Silo were among the attendees of this Zoom call to discuss the written budget for the 2024 Melon Crop.

253.     The written budget for the 2024 Melon Crop included the farm costs to be funded between December of 2023 and September of 2024, including the shipping and harvest costs, the expected revenue generated from the harvest and sale of the 2024 Melon Crop, the per acre production of the 2024 Melon Crop in bins, the acreage included in the 2024 Melon Crop, the per

bin expected revenue from the 2024 Melon Crop, the total expected revenue from the 2024 Melon Crop, the gross and net profit expected from the 2024 Melon Crop.

254.    The written budget for the 2024 Melon Crop also included the monthly financial needs of the 2024 Melon Crop to be funded by Silo in ten (10) monthly installments between December of 2023 and September of 2024.

255.    Plaintiff designed the 2024 Melon Crop budget around a full growing cycle, and all parties knew that a failure during the growing season would result in a disastrous loss for the farming operation. The Parties understood that "time was of the essence," as it is with all Produce operations, because, for instance, if irrigation, fertilizer, or harvesters are two weeks late, the entire crop may be ruined.

256.    Plaintiff demonstrated to Silo the precise amounts of funds required, at the precise dates, to grow the agreed upon acreage of Produce.

257.    That negotiation culminated in Silo's approval of the written farm budget for the 2024 Melon Crop, which included the precise amounts and timing of the amounts required from Silo for Plaintiff to bring the agreed-upon acreage to bear fruit.

258.    From January 2024 until February, Silo performed precisely in accordance with the farm budget agreement, making each loan or advance in the amount specified on the date specified. This clearly evidenced the Parties' agreement that Silo would loan or advance these funds on these dates in accordance with the farm budget agreement.

259.    However, on February 13, 2024, Silo agreed to provide $1,427,246.00 to Plaintiff for the 2024 Melon Crop but failed to provide these funds.

260.    On March 5, 2024, Silo agreed to provide $1,406,274.00 to Plaintiff for the 2024 Melon Crop but short paid this obligation by $208,440.00.

261.    In April of 2024, Silo failed to provide Plaintiff with any funds for the 2024 Melon Crop.

262.    On May 5, 2024, Silo provided Plaintiff with $1,000,000.00 of funds for the 2024 Melon Crop and, thereafter, informed Plaintiff that Silo was no longer able to provide additional funding and directed Plaintiff to seek funding elsewhere.

263.    Specifically, on May 21, 2024, Silo sent Plaintiff an e-mail discussing an "unexpected disruption in our ability to provide funding" and stated that "we would encourage you to seek out other MCA and/or factoring companies if you are in need of funding in the short term."

264.    Silo breached the parties aforementioned farm budget agreement by wrongly and unjustifiably failed or refused to pay or timely pay or advance to Plaintiff the amounts identified in the agreed upon farm budget agreement.

265.    Plaintiff performed all conditions of the farm budget agreement by, *inter alia*, planting and cultivating all of the average identified in the farm budget agreement for the 2024 Melon Crop.

266.    As a direct result of Silo's breach of contract, Plaintiff had inadequate funds to satisfy the requirements of the 2024 Melon Crop budget agreement, which meant Plaintiff was unable to time pollinate, cultivate, prune, harvest, and otherwise ensure the 2024 Melon Crop was brought to fruition.

267.    As a direct result of Silo's breach of contract, Plaintiff's 2024 Melon Crops suffered significant crop yield loss (i.e., over 50% less bins produced per acre than projected), had quality and condition issues (e.g., size issues, quality issues, higher percentage of unpackable melons, etc.), and Plaintiff lost significant sales revenue.

268.    In fact, Plaintiff failed to bring to market an expected $15,640,000 of Produce, valued at sales price, with an expected net profit to Plaintiff of $3,320,730.00.

WHEREFORE, Plaintiff prays for entry of a Final Judgment in favor of Plaintiff and against the Silo for breach of contract in the current amount of not less than $3,320,730.00, plus further interest and costs of collection, including attorneys' fees, incurred in this action, less any actual recovery on other Counts herein;

**COUNT VII**

**<u>BREACH OF FIDUCIARY DUTY</u>**

**PRINCIPAL**

269.    Plaintiff re-alleges paragraphs 1 through 10, 21 through 64, and 65 through 195 as though fully set forth herein.

270.    Principal serves alongside Silo as a co-trustee of Plaintiff's PACA Trust Assets.

271.    As a co-trustee of the PACA Trust, Principal participated with Silo in the administration and management of Plaintiff's PACA Trust Assets.

272.    As a co-trustee of Plaintiff's PACA trust, Principal owes a fiduciary duty of loyalty to act in the best interest of Plaintiff's PACA Trust Assets and the beneficiaries thereof and to refrain from self-dealing.

273.    As a co-trustee of the PACA trust, Principal owes a fiduciary duty of prudence that required Principal to exercise reasonable care, skill, and caution in the management and administration of the PACA Trust Assets.

274.    As an officer, director, or shareholder of Silo, Principal controlled and managed or was in a position to control and manage Plaintiff's operations and had control over its financial dealings.

275.    As an officer, director, or shareholder of Silo, Principal had the authority to direct the payment of Plaintiff's operating funds and otherwise had the power to direct the application or disposition of its assets.

276.    As an officer, director, or shareholder of Silo, Principal was in a position to influence Plaintiff's application of its operating funds and otherwise had the power to influence the application or disposition of its assets, including its PACA Trust Assets.

277.    At all times relevant to this action, Principal was an authorized signatory on Plaintiff's bank account(s) and otherwise had the power to electronically direct the application or disposition of its assets, including its PACA Trust Assets.

278.    As an officer, director, or shareholder of Silo, Principal was in a position to exercise judgment, discretion, and control over Plaintiff's operations and its financial dealings, which included, *inter alia*, ensuring that Plaintiff neither acted nor failed to act in any manner that could result in Plaintiff's violation of its obligations to Plaintiff under PACA.

279.    As an officer, director, or shareholder of Silo, Principal knew or should have known of Plaintiff's failure to promptly pay its PACA trust beneficiaries.

280.    As an officer, director, or shareholder of Silo, Principal possessed the power necessary to counteract or obviate any decision of Plaintiff, not to pay its PACA trust beneficiaries and any decision by Silo to receive or seize and retain Plaintiff's PACA Trust Assets for its sole use and benefit.

281.    Principal caused Silo to commit a breach of the PACA trust by, *inter alia*, transferring PACA Trust Assets from Plaintiff to Silo, as a non-PACA trust beneficiary, in violation of its duties under the PACA.

282.     Principal knew or should have known, at the time Silo and Principal transferred PACA Trust Assets to itself and away from Plaintiff's PACA trust beneficiaries, Plaintiff lacked the ability to pay both Silo and its PACA trust creditors.

283.     Because Silo and Principal failed or refused to stop receiving or seizing and retaining Plaintiff's PACA Trust Assets upon notice and demand from Plaintiff, Principal breached his fiduciary duty to Plaintiff and Plaintiff's PACA trust beneficiaries under PACA.

284.     Because Silo and Principal's transfer of Plaintiff's PACA Trust Assets to Silo impaired the ability of Plaintiff to promptly pay its Produce suppliers in the ordinary course of its business, Principal breached his fiduciary duty to Plaintiff and Plaintiff's PACA trust beneficiaries under PACA to ensure that there were, at all times, sufficient assets available to satisfy all of Plaintiff's Produce related obligations to its suppliers.

285.     Because Silo and Principal withdrew funds from Plaintiff and transferred said funds to itself while Plaintiff's Produce suppliers remained unpaid, Principal breached his fiduciary duty to Plaintiff under PACA to preserve the PACA Trust Assets and not to dissipate PACA Trust Assets.

286.     Because Principal failed to counteract or obviate the decisions of Silo, its officers, managers, directors, shareholders, or agents, to pay Silo from Plaintiff's PACA Trust Assets ahead of Plaintiff's PACA trust beneficiaries, Principal breached its fiduciary duties to Plaintiff under PACA.

287.     On information and belief, persons or entities who are not PACA trust beneficiaries received PACA Trust Assets from Silo subject to the Plaintiff's PACA trust claims herein.

288.     As a direct result of Principal's interference with Plaintiff's PACA Trust Assets and the delivery of the same to Plaintiff's PACA trust beneficiaries, the Plaintiff has incurred

damages in an amount not less than in the current amount of not less than $864,867.52, plus further interest.

WHEREFORE, Plaintiffs respectfully request this Court enter Judgment against Principal and in favor of Plaintiff determining that Principal violated his fiduciary duty to Plaintiff, as described above, and awarding Plaintiff an amount of damages to be proven at trial, but not less than $864,867.52. Plaintiff further respectfully requests whatever additional relief, under law or equity, that this Court shall determine to be just and proper.

## COUNT VIII

## TORTIOUS INTERFERENCE WITH RECEIPT OF TRUST ASSETS

### DEFENDANTS

289.    Plaintiff re-alleges paragraphs 1 through 10, 21 through 64, 65 through 195, and 269 through 288 as though fully set forth herein.

290.    Defendants, together with Plaintiff, were responsible for or in a position of responsibility for overseeing, managing, and directing the Plaintiff's use of its PACA Trust Assets.

291.    As a PACA licensed dealer of Produce, Plaintiff utilized the invoice method of preserving its rights and interests in its customers PACA trust.

292.    Because Plaintiff's preservation of its rights and interests under PACA is a standard practice utilized by Plaintiff in connection with its sale of Produce, Plaintiff possessed a reasonable expectation that its customers, as a PACA licensed dealers of Produce themselves, would comply with the law and make full and payment promptly to Plaintiff for all sums owing in connection with every Produce transaction between the parties.

293.    Plaintiff expected its customers to comply with the law and promptly pay Plaintiff the full amount of its unpaid invoices to each Produce customer.

294.   Defendants transfer or diversion of customer payments away from Plaintiff to itself, as a non-PACA trust beneficiary, was unlawful and resulted in the diversion of those PACA Trust Assets away from Plaintiff and other similar situated PACA trust beneficiaries.

295.   Defendants' transfer or diversion of customer payments away from Plaintiff to itself was unlawful and constituted a breach of Defendants' fiduciary duty to Plaintiff.

296.   Because Plaintiff currently owes not less than not less than $864,867.52 to its Producer suppliers, all of which is currently unpaid, it is clear that Defendants' transfer or failure to prevent the Silo's transfer of PACA Trust Assets to itself impaired Plaintiff's ability to promptly pay its PACA trust beneficiaries.

297.   In transferring PACA Trust Assets from Plaintiff to Silo, Defendants damaged that property and/or interfered with its delivery to Plaintiff, as trustee of the PACA trust, and Plaintiff's PACA trust beneficiaries.

298.   Defendants failed to ensure that Plaintiff preserved its PACA Trust Assets for the benefit of the Plaintiff's PACA trust creditors.

299.   Defendants' negligent or intentional use of PACA Trust Assets to pay itself when Plaintiff's PACA trust beneficiaries remained unpaid was both wrongful and unlawful under PACA.

300.   Defendants benefitted from Silo's transfer of PACA Trust Assets from Plaintiff to itself and for its own use and benefit.

301.   As a direct result of Defendants' tortious interference Plaintiff's expectancy under PACA, Plaintiff has incurred damages in an amount not less than $864,867.52, plus interest, and costs of collection, including attorneys' fees, incurred in this action.

WHEREFORE Plaintiffs respectfully request this Court enter Judgment against the Defendants, as co-trustees of the PACA trust, for tortious interference with an expectancy under PACA, in the current amount of not less than $864,867.52, plus further interest and costs, including attorneys' fees. Plaintiff further respectfully requests whatever additional relief, under law or equity, that this Court shall determine to be just and proper.

## COUNT IX

## NEGLIGENCE/NEGLIGENCE PER SE STATUTORY FAILURE TO ABIDE

### (All Defendants)

302.     Plaintiff re-alleges paragraphs 1 through 10, 21 through 64, and 196 through 249 as though fully set forth herein.

303.     Silo failed to exercise due care when it engaged in lending practices and/or lending brokerage practices without a license in California.

304.     The California Finance Lenders Law (Cal. Fin. Code, § 22000 et seq.) includes Section 22100, subdivision (a), which states that "[n]o person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner." Cal. Fin. Code § 22100 (2024). Moreover, a "'Finance lender' includes any person who is engaged in the business of making consumer loans or making commercial loans." Cal. Fin. Code § 22009 (2024).

305.     Silo represented to Plaintiff that Silo was not a lender, and that the commercial transaction it proposed was a "true sale" or "factoring agreement" in which Silo had commiserate risk. However, this was not true, as Silo insulated itself from all risk, rendering the alleged factoring agreement in fact a commercial loan (or series of loans) under California law.

306.     The Finance Lenders Law provides a penalty for willful violations concerning commercial loans, namely a fine and possible imprisonment. Cal. Fin. Code, § 22780 (2024).

307.     Negligence per se under Cal. Evid. Code, § 669 (presumption of failure to exercise due care on the basis of statutory violation) requires a showing of four elements. The plaintiff must show that the defendant (i) violated a statute, ordinance or regulation of a public entity, (ii) that the violation proximately caused the injury, (iii) that the injury resulted from an occurrence of the nature that the statute was designed to prevent, and (iv) that the plaintiff was one of the class of persons for whose protection the statute was adopted.  See *Dirosa v. Showa Denko K.K.*, 44 Cal. App. 4th 799, 801, 52 Cal. Rptr. 2d 128, 129 (1996).

308.     By engaging in a commercial lending operation without a license, Silo has violated Cal. Fin. Code § 22100 (2024).

309.     This statute creates a duty of care that Silo must abide by.

310.     Silo knew or should have known that lending without a license would violate the law. Cal. Fin. Code § 22100 (2024) was designed to prohibit the exact behaviors in which Silo has willfully engaged.

311.     Silo did not use the standard of care that a reasonable person should have used in these circumstances when it willfully and wantonly engaged in the practice of commercial lending without a license.

312.     Had Plaintiff known and understood that Silo was engaged in the business of commercial lending in violation of the California Code, Plaintiff never would have engaged in business with Silo.

313.     As the victim of Silo, an unlicensed lender doing business and making loans from California, Plaintiff is an entity protected by Cal. Fin. Code § 22100 (2024).

314.     Plaintiff is therefore entitled to damages pursuant to Silo's negligence per se under its statutory duty to abide.

315.     Plaintiff is and will continue to be damaged by Silo's negligence per se.  Plaintiff has suffered damage to its farm, its production of a saleable crop, damage to its relations with its customers in the form of lost past sales and lost prospective sales, to its reputation and goodwill, and to its prospective business relations, in an amount no less than $15,640,000.00.

WHEREFORE, Plaintiff respectfully asks this Honorable Court to find that Silo has violated California's regulations in a negligent fashion which has damaged Plaintiff, and to enter an award for damages in favor Plaintiff and against Defendant, in an amount to be proven at trial. Plaintiff additionally respectfully requests any and all additional relief and/or equitable relief this Honorable Court deems proper and appropriate.

## COUNT X

### Fraudulent Concealment/Suppression

### ALL DEFENDANTS

316.     Plaintiff re-alleges paragraphs 1 through 10, 21 through 64 as though fully set forth herein.

317.     On or about January 4, 2024, Plaintiff and Silo met via Zoom call to discuss a budget for the entire 2024 Melon Crop.

318.     Gurdeep Billian of Plaintiff and Jeff Butler of Silo were among the attendees of this Zoom call to discuss the written budget for the 2024 Melon Crop.

319.     The written budget for the 2024 Melon Crop included the farm costs to be funded between December of 2023 and September of 2024, including the shipping and harvest costs, the expected revenue generated from the harvest and sale of the 2024 Melon Crop, the per acre production of the 2024 Melon Crop in bins, the acreage included in the 2024 Melon Crop, the per

bin expected revenue from the 2024 Melon Crop, the total expected revenue from the 2024 Melon Crop, the gross and net profit expected from the 2024 Melon Crop.

320.    The written budget for the 2024 Melon Crop also included the monthly financial needs of the 2024 Melon Crop to be funded by Silo in ten (10) monthly installments between December of 2023 and September of 2024.

321.    Plaintiff designed the 2024 Melon Crop budget around a full growing cycle, and all parties knew that a failure during the growing season would result in a disastrous loss for the farming operation. The Parties understood that "time was of the essence," as it is with all Produce operations, because, for instance, if irrigation, fertilizer, or harvesters are two weeks late, the entire crop may be ruined.

322.    Plaintiff demonstrated to Silo the precise amounts of funds required, at the precise dates, to grow the agreed upon acreage of Produce.

323.    That negotiation culminated in Silo's approval of the written farm budget for the 2024 Melon Crop, which included the precise amounts and timing of the amounts required from Silo for Plaintiff to bring the agreed-upon acreage to bear fruit.

324.    From January 2024 until February, Silo performed precisely in accordance with the farm budget agreement, making each loan or advance in the amount specified on the date specified. This clearly evidenced the Parties' agreement that Silo would loan or advance these funds on these dates in accordance with the farm budget agreement.

325.    However, on February 13, 2024, Silo agreed to provide $1,427,246.00 to Plaintiff for the 2024 Melon Crop but failed to provide these funds.

326.    On March 5, 2024, Silo agreed to provide $1,406,274.00 to Plaintiff for the 2024 Melon Crop but short paid this obligation by $208,440.00.

327.    In April of 2024, Silo failed to provide Plaintiff with any funds for the 2024 Melon Crop.

328.    On May 5, 2024, Silo provided Plaintiff with $1,000,000.00 of funds for the 2024 Melon Crop and, thereafter, informed Plaintiff that Silo was no longer able to provide additional funding and directed Plaintiff to seek funding elsewhere.

329.    Specifically, on May 21, 2024, Silo sent Plaintiff an e-mail discussing an "unexpected disruption in our ability to provide funding" and stated that "we would encourage you to seek out other MCA and/or factoring companies if you are in need of funding in the short term."

330.    Throughout the Parties' negotiations, Defendant never suggested that it did not have, or have unquestioned access to, the funds required to fulfill its obligations under the farm budget agreement.

331.    However, as is obvious from Silo's May 21, 2024, e-mail communication, Silo was operating what is known as a "table loan," where multiple investors elect whether and how much to invest in each monthly tranche payment or loan toward the 2024 Melon Crop. In many circumstances, this approach, where Silo would offload the investment opportunity on a pool, or table, of investors, would work fine, as Silo could have contractually guaranteed the funds' availability prior to making the first pre-season advance.

332.    Silo did not secure the promised funding in advance and did not tell Plaintiff that it did not secure the funding in advance.

333.    The result was that after May 5, 2024, Silo had no more funds to pay to satisfy the requirements of the 2024 Melon Crop budget agreement. This meant that it was impossible for Plaintiff to bring the entire crop to fruition.

334.    Plaintiff operated under the belief that the funds identified in the farm budget agreement were possessed by and available to Silo and relied on its belief and understanding that Silo possessed the funds it promised to loan Plaintiff for the 2024 Melon Crop.

335.    Silo materially withheld the fact that it did not control these promised funds but was at the will and whimsy of a pool of investors, who might turn sour on the project during the course of the growing season.

336.    This information was material, critical, and vital to Plaintiff, and Silo either knew or should have known this was so. If Plaintiff knew that Silo could not guarantee the funds' availability, and in fact did not possess or have control over the full amount described in the farm budget agreement, <u>Plaintiff never would have engaged in business with Silo</u>.

337.    Silo's decision to withhold this information constitutes fraudulent suppression and concealment, as (i) Silo committed a material concealment or nondisclosure, (ii) that it knew or should have known was material and critical to Plaintiff, (iii) that was intended to induce Plaintiff's agreement to the contract with Silo, (iv) on which Plaintiff reasonably and justifiably relied, and (v) which resulted in damages to Plaintiff.

338.    Melon Corp. has been damaged and continues to be damaged by Silo's fraudulent concealment/suppression in the form of crop loss, lost profits, damaged customer relations, damaged economic prospects, and damaged reputation in the marketplace. In fact, Plaintiff failed to bring to market an expected $15,640,000 of Produce, valued at sales price, with an expected net profit to Plaintiff of $3,320,730.00.

WHEREFORE, Melon Corp. respectfully asks this Honorable Court to find that Silo has fraudulently concealed/suppressed material information which has damaged Plaintiff, and to enter a judgment for damages in favor of Plaintiff and against Defendants, in an amount to be proven at

trial. Plaintiff additionally respectfully requests any and all additional relief and/or equitable relief this Honorable Court deems proper and appropriate.

### COUNT XI

### Intentional Interference with Prospective Economic Advantage

### ALL DEFENDANTS

339. Plaintiff re-alleges paragraphs 1 through 10 and 21 through 64 as though fully set forth herein.

340. In California, intentional or tortious interference with prospective economic advantage requires proof of five elements: (1) the existence, between the plaintiff and some third party, of an economic relationship that contains the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentionally wrongful acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm proximately caused by the defendant's action.

341. Plaintiff has and maintains a list of customers who buy Produce from Plaintiff and this list is maintained by and through Silo's network, which serves as Plaintiff's primary banking and accounting software. Good will with these customers is the most valuable asset Plaintiff possesses. Many of these customers have done business with Plaintiff for years. These customers include entities like Costco Wholesale, Kroger, and others.

342. Plaintiff's customer list and its reputation with its customers is known to Silo.

343. Plaintiff has traditionally had a strong, sound reputation with these customers for delivering quality Produce on time. Maintaining its reputation as a trustworthy, reliable, and financially sound supplier of Produce with the customers is critical for Plaintiff to continue to do business.

344. If customers believe that Plaintiff has violated the law, is in financial crises, or may

be put out of business by creditors, these customers will not believe that Plaintiff can continue to perform as a reliable trade partner. These same customers will believe their own businesses will be at risk if Plaintiff cannot reliably source Produce for them or pay them in a timely manner. If they believe these things, these customers will almost certainly sever their commercial relationship with Plaintiff and work with new Produce suppliers.

345.    If these customers believe that their commercial relationship with Plaintiff exposes them to financial risk, or the threat of litigation, they will likewise sever their relationship with Plaintiff and find a new Produce supplier.

346.    If these customers believe that Plaintiff has been irresponsible with its selection of lending partners, or other commercial partners generally, it will harm Plaintiff's reputation, and the customers may seek new Produce suppliers.

347.    In fact, as a direct result of Silo's failure or refusal to provide promised funding to Plaintiff, Kroger has already severed its relationship with Plaintiff.

348.    On or about May 21, 2024, Silo informed Melon Corp. that it could not perform under the terms of the farm budget agreement, the Instant Pay Contract and the Cash Advance Agreement, as it did not have the funds that it represented were available to Plaintiff. As explained in Count VI, Breach of Contract, when a farming operation relies on funding, and that funding is cut off prior to harvest, pack-out, and sale of the Produce, it places the entire farming operation in grave peril.

349.    Silo knew that if Plaintiff did not have the funds required to sufficiently farm, harvest, pack-out, transport, and sell its Produce, that Plaintiff would be harmed not only with respect to outstanding customer orders for Produce, but also with respect to its future customer relations and its prospective economic advantage with those customers. Silo knew that if it failed

to provide the promised loans and advances, that Plaintiff would not have a sufficient inventory of Produce to sell and honor its contractual obligations to its customers.

350.    Silo knew that if Plaintiff did not harvest enough Produce to meet its outstanding customer orders, that Plaintiff would either have to pay cover costs to purchase replacement Produce from third-party suppliers, harming Plaintiff financially, or Plaintiff would have to fail to deliver the Produce, thus breaching its outstanding customer orders and indelibly harming its reputation.

351.    As a direct result of Silo's failure or refusal to honor its agreements and contracts with Plaintiff, Plaintiff was in fact forced to mitigate its damages and purchase no less than $1,193,356.58 of Produce from third parties between May 1, 2024 and July 30, 2024 to satisfy as many of Plaintiff's customer contracts and orders as possible.

352.    As a direct result of Silo's failure or refusal to honor its agreements and contracts with Plaintiff, Plaintiff was unable to supply its customers with Produce and its customers cancelled $543,400.00 of Produce purchase orders.

353.    Making matters worse, after Silo failed to perform and left Plaintiff's farming operation without funding, and thus up the proverbial creek, on or about July 30, 2024, Defendant Silo, through its attorney, Mark Edelson, Esq., sent letters (the "*False Customer Letters*") to many or all of Plaintiff's customers, including some of Plaintiff's most critical customers such as Costco Wholesale, Peddler's Son, Midwest Best Produce Company, American Melon Company, Mr. Felix, Fidelity Melon, and Pacific Sales Company.

354.    It is apparent that Silo understood that Plaintiff's entire business relies (and will continue to rely) on its relationship with its customers, as Plaintiff's sole line of business is selling Produce to its customers. That Silo possessed this knowledge is self-evident, given Silo's

insistence on possession of and security interests in all Plaintiff's invoices, other statements made in the formation of the farm budget agreement (e.g., understanding Plaintiff's revenue stream), and in statements in the Cash Advance Agreement. For instance, in Section 5.2, the Cash Advance Agreement states, "Customer Communications. Seller [Plaintiff] authorizes Silo to communicate directly with customers with respect to any of payment, invoice, or receivable related to the customer, including receivables not sold to Silo, for any reason, including, without limitation, to remind customers of upcoming due dates, and to verify the amount and validity of receivables."

355.   By sending out these False Customer Letters, Silo knew and intended that it would harm Plaintiff's business, its reputation with these customers, and its future and prospective economic interests.

356.   Critically, Silo had full knowledge of every aspect of Plaintiff's business, as it had instant access to Plaintiff's customer and financial information by virtue of its unlawful, voidable, and void lending agreements, under which Silo had access to all of Plaintiff's transactions through the Silo portal and electronic access to and control over Plaintiff's bank account.[4]

357.   Based on information and belief, it appears that Plaintiff sent a similar False Customer Letter to each and every one of Plaintiff's customers.

358.   In the False Customer Letters, Silo *without limitation* made the following false representations to Melon Corp.'s customers:

a.      "Please be advised that Melon defaulted on its obligations to Silo under the Silo

---

[4] The MCA states at §5.1: "Data Access. Seller authorizes Silo to access and use any Customer Data to verify and confirm receipt by Seller of the Receivables, to aid in calculating the Estimated Periodic Remittance and facilitating its remittance, and otherwise ensure that Seller is in compliance with this Agreement. Seller agrees to link its Bank Account to the Platform such that Bank Account transaction data shall constitute Customer Data. Seller agrees not to take any action to limit Silo's access to or reduce the extent of the Customer Data." The MCA additionally states that "Seller represents and warrants that it owns the Bank Account and is authorized to access, debit, and provide authorization to Silo to debit the Bank Account;" [MCA, §6.b].

Agreements and is indebted to Silo for the Balance Owed."

b.      "Silo is aware that You possess accounts receivables due and owing to Melon or are otherwise indebted to Melon. Under UCC § 9-406, after receipt of this notice, "the account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor." In other words, You may only satisfy the debt that You owe Melon by paying Silo."

c.      "You are hereby notified to immediately pay all monies in your possession currently due and owing to Melon and all sums in your possession that would be payable to Melon to Silo, care of the undersigned, until the Balance Owed accrues."

d.      "Your failure to remit to Silo all sums owed to Melon up to the Balance Owed will constitute a violation of the UCC and interference with the Silo Agreements."

359.    In short, according to Silo, unless Plaintiff's customers pay Silo every penny owed or owing to Plaintiff, Silo's customers will have violated the UCC and committed a tort. The improper threat of legal action by Silo against Plaintiff's customers is apparent.

360.    These statements, allegations, and threats are false, and Silo knew or should have known they were false and that they would severely injure Plaintiff.

361.    Silo knew or should have known these positions were false because, *inter alia*:

a.  The Instant Pay Contract and the Cash Advance Agreement are both voidable based upon Silo's practice of lending without a license, lending with deferred account deposit control while also claiming a security interest (which is proven beyond dispute by Silo's UCC filings and these customer letters), by engaging in Deferred Deposit Loans that last more than thirty-five (35) days, and for other statutory violations of the California and Nevada code. Because the Instant Pay Contract and the Cash Advance Agreements are void, Silo cannot claim security interests in Plaintiff's accounts receivable, and there are no viable contracts with which Plaintiff's customers could "interfere."

b.  The Cash Advance Agreement is void for lack of mutuality of consideration. Specifically, the Cash Advance Agreement, which incorporates all other relevant agreements, states that no matter what Silo does or does not do, no matter how if performs or fails to perform, that Plaintiff cannot seek any damages or relief against Silo whatsoever. This renders the Cash Advance Agreement optional and requires Silo to do nothing whatsoever, thus rendering the entire Cash Advance Agreement void for lack of mutuality.

362.    In the alternative, in the event that both the Instant Pay Contract and the Cash

Advance Agreement are not void, Silo cannot claim rights under either the Instant Pay Contract or the Cash Advance Agreement when it breached the agreements first, as it did when it anticipatorily repudiated the Instant Pay Contract and the Cash Advance Agreement and when it failed to perform under said agreements..

363.    Finally, Silo has no legal right to PACA Trust assets which must be held in trust for the trust beneficiaries. Silo has and continues to violate the provisions of PACA in this respect..

364.    Silo's actions— e.g., repudiating the farm budget agreement and its related Instant Pay Contract and the Cash Advance Agreement, leaving Plaintiff with a farming operation it could not afford, failing to make required advances, and sabotaging Plaintiff with its existing customers through the False Customer Letters— were taken by Silo with the knowing intent of harming Plaintiff and its PACA trust beneficiaries to advantage Silo. Thereby Silo sought to appropriate funds owed to Plaintiff and Plaintiff's PACA trust beneficiaries under contract and by virtue of Plaintiff's rights, roles, and responsibilities both as a PACA trust beneficiary of its customers and as a co-trustee of Plaintiff's PACA Trust Assets, when Silo had no viable legal claim to these funds and was duty bound to refrain from such conduct.

365.    These actions have made Plaintiff liable to third-party PACA trust beneficiaries.

366.    These actions have caused serious concerns with Plaintiff's customers, with many contacting Plaintiff and expressing serious doubts about the viability of an ongoing commercial relationship with Plaintiff.

367.    These actions have also harmed Plaintiff with third parties who may in the future become customers, as Plaintiff has learned the False Customer Letters have been circulated throughout the Produce industry.

368.    Moreover, even creditors of Plaintiff, including third party Produce suppliers who

are PACA trust beneficiaries, have learned about the False Customer Letters and are concerned. One supplier has even demanded that Plaintiff's payment terms be altered from the traditional thirty-day payment period to "net zero," meaning Plaintiff can only acquire Produce from this supplier if it has cash on hand.

369.     Silo knows Plaintiff cannot have cash on hand when Silo seeks through legal threats to appropriate all of Plaintiff's accounts receivable from every source. Thus, in the span of less than a week, Plaintiff's False Customer Letters have already caused Plaintiff provable, actual damages in that the False Customer Letter injured and effectively terminated at least one of Plaintiff's supplier relationships.

370.     That all these harms to Plaintiff and its ability to function as a Produce distributor and supplier would occur based on Silo's unlawful actions, was known to Silo.

371.     Silo's willful, wanton, and unlawful actions and communications constitute intentional and tortious interference with Plaintiff's prospective economic advantage and benefit, and have damaged and will continue to damage Plaintiff.

WHEREFORE, Plaintiff respectfully asks this Honorable Court to find that the Defendants have committed the tort of Tortious Interference with Prospective Economic Advantage, which has damaged Plaintiff, and to enter an award for damages in favor Plaintiff and against the Defendants, in an amount to be proven at trial.  Plaintiff additionally respectfully requests any and all additional relief and/or equitable relief this Honorable Court deems proper and appropriate.

## COUNT XII

**For Statutory Recission, Cal.Civ.Code § 1689 (2024) (*Pled in the Alternative*):**
**<u>Unlawful Lending without Licensure in Violation of Statute</u>**

### SILO

372.     Plaintiff re-alleges paragraphs 1 through 10, 21 through 64, and 196 through 249

as though fully set forth herein.

373.    Silo's series of contracts, including the Cash Advance Agreement, including its related order forms, Instant Pay Contract, and the farm budget agreement, together constitute a lending agreement under California and Nevada law, because Silo's lending agreement with Plaintiff is "an express or implied agreement where one person advances money to the other who agrees to repay it according to terms such as time and interest."[5]   Under California law, a transaction may be a loan although called something else by the parties thereto; the Court must look to the substance of the transaction and not to its form.[6]

374.    Given Silo's recently published position in the False Consumer Letters that it is entitled to be made whole even from PACA Trust funds, it is beyond dispute that the series of contracts and subcontracts offered by Silo to Plaintiff in Nevada, had the purpose and effect of loaning funds to Plaintiff for which Silo (i) received collateral, (ii) security interests, (iii) a right to electronically control the banking account of Silo, and (iv) an expectation to be repaid its principal with interest, costs, late fees, and/or service charges. Thus, the overall collective agreement is a lending agreement.  It is also beyond dispute that Silo maintained and exercised electronic control over Plaintiff's bank account in Nevada under both the Cash Advance Agreement and Instant Pay Contract documents.

375.    <u>Silo</u> is not licensed in California, Nevada, or in any jurisdiction, to act as a lender or lending broker, violating Nevada Code § 604A generally, and Cal. Fin. Code § 22100 (2024), which both prohibit this type of unauthorized, unlicensed lending practices.

---

[5] *Clark v. United States*, 2012 U.S. Dist. LEXIS 181928, at *6, (N.D. Cal. Dec. 26, 2012), citing *Welch v. Comm'r of Internal Rev.*, 204 F.3d 1228, 1230 (9th Cir. 2000).
[6] *Grewal v. Choudhury*, 2008 U.S. Dist. LEXIS 54731, at *15 (N.D. Cal. May 30, 2008), emphasis added.

376.    Given that Plaintiff's loan agreement with Silo authorized Silo to electronically control and pay itself directly from Plaintiff's bank account, under Nevada law this constitutes a "deferred deposit loan." Specifically, in Nevada Code § 604A, a lender "shall not operate" a "deferred deposit loan service" "unless the person is licensed with the Commissioner pursuant to the provisions of this chapter." Moreover, a lender "must have a license regardless of the location or method that the person uses to operate such a service, including, without limitation, at a kiosk, through the Internet, through any telephone, facsimile machine or other telecommunication device or through any other machine, network, system, device or means…" And, any lender, "and any member, officer, director, agent or employee thereof, who violates or participates in the violation of any provision of this section is guilty of a misdemeanor." Nev. Rev. Stat. Ann. § 604A.400 (2023).

377.    In Nevada, deferred deposit loans are those in which the borrower provides authorization for the electronic transfer of funds on a future date in exchange for a loan,[7] and an unlicensed lender's violations renders the loan agreement **voidable** at the option of the other party to the transaction.[8]

378.    Under both California and Nevada law, a voidable transaction is one where one or more parties have the power by a manifestation of election to avoid the legal relations created by the contract.[9] Such an agreement may be declared void.[10] A voidable contract, once declared void,

---

[7] *State Dep't of Bus. & Indus. v. Dollar Loan Ctr., Ltd. Liab. Co.*, 134 Nev. 112, 112-13, 412 P.3d 30, 32 (2018).
[8] *24/7 Ltd. v. Schoen*, 133 Nev. 975, 399 P.3d 916 (2017), emphasis added.
[9] *Yvanova v. New Century Mortg. Corp.*, 62 Cal. 4th 919, 930 (2016), citing Rest.2d Contracts, § 7, p. 20.
[10] *Id.*, citing *Little v. CFS Service Corp.*,188 Cal. App. 3d at p. 1358.

is extinguished, voided, and without legal effect.[11] "It binds no one and is a mere nullity."[12] "Such a contract has no existence whatever. It has no legal entity for any purpose…"[13]

379.    In California, a party to a contract may rescind the contract pursuant to the Cal. Civ. Code § 1689 (2024) through a count in a civil complaint.[14] A contract may be rescinded, *inter alia* (i) if the consideration for the obligation of the rescinding party becomes entirely void from any cause, (ii) if the consideration for the obligation of the rescinding party, before it is rendered to him, fails in a material respect from any cause, (iii) if the contract is unlawful for causes which do not appear in its terms or conditions, and the parties are not equally at fault (including specific violations of California's Code), or (iv) if the public interest will be prejudiced by permitting the contract to stand. *Id*.

380.    Likewise, the Nevada Supreme Court has also stated that, "an unlicensed lender's violations <u>renders the loan agreement</u> **voidable** <u>at the option of the other party to the transaction</u>."[15] In Nevada, contracts which violate a state statute "will be deemed voidable and thus unenforceable."[16] "The statutes, in effect, make an unapproved loan or security transaction voidable by any party in interest."[17] "In Nevada, a contract is void *ab initio* if it is rescinded or violates public policy."[18]

381.    Silo engaged in the unlawful practice of lending, or brokering loans, without proper

---

[11] *Id*., citing Rest.2d Contracts, § 7, com. a, p. 20.
[12] *Id*., citing *Little v. CFS Service Corp.*, at 1362.
[13] *Yvanova* at 929.
[14] Although recovery for both rescission and breach of contract is barred, at the pleading stage a plaintiff is permitted to plead inconsistent or alternative counts. *Rowley v. James*, 2021 Cal. Super. LEXIS 42081, *3-4, citing *Skelly v. Richman* (1970) 10 Cal.App.3d 844, 856.
[15] *24/7 Ltd. v. Schoen*, 133 Nev. 975, 399 P.3d 916 (2017), emphasis added.
[16] *Topaz Mut. Co. v. Marsh*, 108 Nev. 845, 852-53, 839 P.2d 606, 611 (1992).
[17] *Id*.
[18] *Bergstrom v. Estate of DeVoe*, 109 Nev. 575, 577, 854 P.2d 860, 862 (1993).

licensure in California or Nevada. Plaintiff therefore seeks a finding *in the alternative* that the entire lending agreement with Silo is rescinded and void.

WHEREFORE, Plaintiff respectfully asks this Honorable Court to find and enter judgment that the entire lending agreement between Plaintiff and Silo, as defined supra and to include the Cash Advance Agreement, Instant Pay Contract, and the Silo Cash Advance Program Order Forms, are together unenforceable, void, illusory, rescinded, and of no legal effect.

## COUNT XIII

**For Statutory Recission, Cal.Civ.Code § 1689 (2024) (*Pled in the Alternative*):**
**Silo's Lending Agreement is Illusory, Unenforceable, and Void**
**for Lack of Mutuality of Obligation and Lack of Consideration**

### SILO

382.     Plaintiff re-alleges paragraphs 1 through 10, 21 through 64, and 196 through 249 as though fully set forth herein.

383.     Silo's Cash Advance Agreement incorporates all relevant contracts to the lending agreement (defined supra) at issue in this dispute, stating:

a.     "This Agreement incorporates by reference all terms and conditions of Silo's Terms of Use (available at usesilo.com/terms) and Privacy Policy (available at usesilo.com/privacy), unless explicitly superseded by this Agreement. In the event of a conflict between the terms of this Agreement and of the Terms of Use or Privacy Policy, this Agreement shall govern with respect to the subject matter of such conflicting terms." [Cash Advance Agreement, P.1].

b.     "Each such sale [of Plaintiff's invoices] is subject to the terms of the Agreement" [Cash Advance Agreement, §1.2]. This would *de facto* include each Silo Cash Advance Program Order Form and the Instant Pay Contract.

c.     Section 7.1(a) incorporates "any other agreement now or hereafter entered into with Silo" [Cash Advance Agreement, §7.1(a)].

384.     Moreover, under the Cash Advance Agreement, Silo's only assumed risk occurs when and if Plaintiff declares bankruptcy or ceases business operations:

d.     "Silo retains recourse against Seller for all losses that do not arise out of Events of

Assumed Risk." [Cash Advance Agreement, §2, P.1].

e.    Events of Assumed Risk include only Melon Corp.'s failure to pay the "Total Remittance Amount due to bankruptcy, or Seller's business ceasing" [*Id.*]

385.    In short, outside of Plaintiff's declaring bankruptcy or otherwise ceasing to be in business, Silo is secured against all loss, not only against Plaintiff, but allegedly against Plaintiff's officers as personal guarantors, despite these individuals not being a signatory in an individual capacity on any contract with Silo. [Cash Advance Agreement, §8].[19] Silo even claimed the right "without notice to [the non-signatory] Guarantors" and "without the indorsement or execution by Guarantors" to "change the manner" "or terms of payment," to "sell" or "deal with in any manner" "any property at any time pledged or mortgaged to secure the liabilities or obligations [of Plaintiff and the Guarantors]." *Id.* The Cash Advance Agreement then appears to state that the Personal Guarantors (who are not signatories to this document, which itself is not signed but merely incorporated by hyperlink into agreements that are also not signed in any individual capacity by any Guarantor) remain liable even if and when Silo is made whole on its alleged loss from other parties. *Id.*

386.    The Cash Advance Agreement states this improper and unlawful Personal Guarantee continues to hold the non-signatory individuals liable, even in the aforementioned "Event of Default." This means that Silo bares no risk whatsoever for non-performance of Plaintiff's customers (proving the entire scheme constitutes a lending agreement).

---

[19] Section 8.1 of the Cash Advance Agreement states, "Each Guarantor hereby unconditionally guarantees the performance of Seller's Obligations hereunder. Upon failure by Seller to pay punctually any Obligation, including, without limitation, the prompt payment of Silo Receivables, the Guarantors shall forthwith on demand pay the amount not so paid at the place and in the manner specified in this Agreement. The obligations of the Guarantors hereunder shall be unconditional and absolute and shall not be released or discharged until any other amount payable by Seller under this Agreement shall have been paid in full."

387.   On the other hand, if Silo failed to perform, it could have no liability whatsoever, as the Cash Advance Agreement states: "<u>Limitation of Liability</u>. In no event will Silo be liable to Seller [Plaintiff herein] or a third party for any direct, indirect, incidental, special, consequential, exemplary, liquidated, or punitive damages, including damages under warranty, contract, tort, negligence, or any other claims, arising out of or relating to this Agreement, even if Silo has been advised of the possibility of such damages." [Cash Advance Agreement, §18.2]. This language means that Silo was completely free, with no risk and no possibility of judgment, damages, or other recourse by Melon Corp., to perform or not perform any and all obligations under the Lending Agreement at its pleasure.

388.   In fact, not only does the Cash Advance Agreement prohibit Melon Corp. from ever collecting damages from Silo, no matter what tortious or unlawful behavior Silo committed with respect to the lending agreement (including if Silo willfully failed to perform its obligations under the lending agreement) the Cash Advance Agreement also states that Plaintiff "shall indemnify and hold harmless Silo, its affiliates and their respective officers, directors, employees and agents" against "all suits, claims, liabilities, demands and expenses (including reasonable attorneys' fees and collection costs) resulting from or arising out of this Agreement, whether directly or indirectly, including the transactions or relationships contemplated thereby and hereby…" [Cash Advance Agreement §15]. The only exception is if such claims result "solely from Silo's gross negligence or willful misconduct," [*Id.*], ostensibly meaning that this predatory, one-sided, outrageous Lending Agreement demands not only that Plaintiff can never recover a penny in damages from Silo related to the lending agreement, for any conduct whatsoever, but that if Plaintiff successfully sued Silo for negligence or breach of contract, Plaintiff would have to pay both Silo's legal fees as well as any judgment a Court awarded Plaintiff against Silo. Such an outcome, though

apparently required under the lending agreement, is an offense to contract law and public policy.

389.    "A contract is unenforceable as illusory when one of the parties has the unfettered or arbitrary right to modify or terminate the agreement or assumes no obligations thereunder." *1617 Westcliff LLC v. Wells Fargo Bank N.A.*, 686 F. App'x 411, 413 (9th Cir. 2017), quoting *Harris v. Tap Worldwide, LLC*, 248 Cal. App. 4th 373, 203 Cal. Rptr. 3d 522, 531 (Ct. App. 2016). "[A] party may not reserve to itself a method of unlimited exculpation without rendering its promises illusory and the contract void." *Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1357 (Fed. Cir. 2009), citing *Torncello v. United States*, 681 F.2d 756, 760, 231 Ct. Cl. 20 (Ct. Cl. 1982) and 1 Richard A. Lord, Williston on Contracts § 4.27 (4th ed. 1999) ("[W]here the promisor retains an unlimited right to decide later the nature or extent of his or her performance[, the] unlimited choice in effect destroys the promise and makes it illusory.").

390.    In California, a party to a contract may rescind the contract pursuant to the Cal. Civ. Code § 1689 (2024) through a count in a civil complaint.[20] A contract may be rescinded (i) if the consideration for the obligation of the rescinding party becomes entirely void from any cause, (ii) if the consideration for the obligation of the rescinding party, before it is rendered to him, fails in a material respect from any cause, (iii)  if the contract is unlawful for causes which do not appear in its terms or conditions, and the parties are not equally at fault (including specific violations of California's Code), or (iv) if the public interest will be prejudiced by permitting the contract to stand. *Id*.

391.    Likewise, the Nevada Supreme Court has also stated that, "an unlicensed lender's

---

[20] Although recovery for both rescission and breach of contract is barred, at the pleading stage a plaintiff is permitted to plead inconsistent or alternative counts. *Rowley v. James*, 2021 Cal. Super. LEXIS 42081, *3-4, citing *Skelly v. Richman* (1970) 10 Cal.App.3d 844, 856.

violations <u>renders the loan agreement **voidable** at the option of the other party to the transaction</u>."[21] In Nevada, contracts which violate a state statute "will be deemed voidable and thus unenforceable."[22] "The statutes, in effect, make an unapproved loan or security transaction voidable by any party in interest."[23] "In Nevada, a contract is void *ab initio* if it is rescinded or violates public policy."[24]

392.    The plain language of the Cash Advance Agreement document provides no remedy whatsoever for Plaintiff in the event that Silo breaches the agreement or any associated agreement, or commits any other tort or violation of the law in connection with its performance (or non-performance) of the lending agreement. As such, Silo is at liberty to decide without consequence when and if it will perform, rendering the lending agreement illusory as Silo has no real obligation to do anything. Therefore, Plaintiff respectfully requests that the Court should determine that the entire lending agreement is void *ab initio,* as it is illusory, void for lack of mutuality, obligation, and consideration, and as such, against public policy.

WHEREFORE, Plaintiff respectfully asks this Honorable Court to find and enter judgment that the entire lending agreement, as defined supra and to include the Cash Advance Agreement, Instant Pay Contract, and the Silo Cash Advance Program Order Forms, are together unenforceable, void, illusory, rescinded, and of no legal effect.

### COUNT XIV
### Injunctive Relief
### (All Defendants)

393.    Plaintiff re-alleges paragraphs 1 through 10, 21 through 64, 65 through 175, and

---

[21] *24/7 Ltd. v. Schoen*, 133 Nev. 975, 399 P.3d 916 (2017), emphasis added.
[22] *Topaz Mut. Co. v. Marsh*, 108 Nev. 845, 852-53, 839 P.2d 606, 611 (1992).
[23] *Id.*
[24] *Bergstrom v. Estate of DeVoe*, 109 Nev. 575, 577, 854 P.2d 860, 862 (1993).

CIVIL COMPLAINT                                                    Page 69 of 71

196 through 249 as though fully set forth herein.

394.    The Perishable Agricultural Commodities Act, California's Unfair Trade Practices Act, and Nevada law all provide for injunctive relief to stop inappropriate activities under the individual statutes.

395.    Defendants have violated the various requirements against unlicensed lending, breach of the PACA trust, and related prohibitions identified in each of the statutes identified above.

396.    Defendants wrongful conduct has harmed, and continues to harm, Plaintiff, subjecting Plaintiff to civil and regulatory liability, damaging Plaintiff's reputation in the Produce industry and jeopardizing Plaintiff's ability to operate as an ongoing concern.

397.    Defendants' actions are causing Plaintiff immediate and irreparable harm, which can only be remedied by equitable action on the part of this Court.

WHEREFORE, Plaintiff prays for entering an order compelling the preservation of the Plaintiff's PACA Trust Assets in Defendants' custody, possession, or control for the benefit of the Plaintiff and Plaintiff's PACA trust beneficiaries, (ii) entering an Order directing the Defendants to immediately turn over to the registry of the Court all assets impressed with the PACA trust for the benefit of Plaintiff and Plaintiff's unpaid trust beneficiaries, (iii) entering an order directing Silo to cease and desist all unlicensed lending operations unless and until the Court is completely satisfied that Company is properly capitalized, not insolvent, and able to operate in compliance with PACA and applicable state law, and; (iv) entering a Final Judgment in favor of Plaintiff and against the Defendants in an amount to be proven at trial. Plaintiff additionally respectfully requests any and all additional relief and/or equitable relief this Honorable Court deems proper and appropriate.

**NOTICE OF JURY DEMAND** – Pursuant to Federal Rule of Civil Procedure 38(b), the

Plaintiff hereby demands a trial by jury in this action.

Respectfully Submitted this 6th of August, 2024:

/s/ Kathryn S. Dimer, Esq.
Kathryn S. Diemer, Esq.
DIEMER & WEI, LLP

Jason R. Klinowski, Esq.
(pro hac vice application forthcoming)
KLINOWSKI DAMIANO LLP

| CIVIL COMPLAINT | Page 71 of 71 |