UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MELON CORP,<br><br>    Plaintiff,<br><br>  v.<br><br>SILO TECHNOLOGIES, et al.,<br><br>    Defendants. | Case No. 24-cv-04781-NW<br><br>**ORDER GRANTING MOTION TO COMPEL ARBITRATION AND STAY THE ACTION**<br><br>Re: ECF No. 18 |

Plaintiff Melon Corp. ("Melon" or "Plaintiff") brings claims under the Perishable Agricultural Commodities Act ("PACA"), various California and Nevada statutes, and claims for breach of contract, breach of fiduciary duty, tortious interference, negligence, fraudulent concealment/suppression, and intentional interference with prospective economic advantage against Defendants Silo Technologies, Inc. ("Silo") and Ashton Braun (collectively "Defendants"). Defendants separately move to compel arbitration based on arbitration clauses in their respective agreements with Plaintiff. Mot. to Compel Arbitration, ECF No. 18 ("Mot."). Having considered the parties' briefs and the relevant legal authority, the Court concludes oral argument is not required, *see* N.D. Cal. Civ. L.R. 7-1(b) and GRANTS the motion to compel arbitration.

Melon Corp., Silo Technologies, Inc., and Ashton Braun are compelled to engage in arbitration pursuant to the arbitration agreement. The case is STAYED pending arbitration. The Court DENIES as moot, all other pending motions, including the Motion to Intervene (ECF No. 37), Motion for Preliminary Injunction (ECF No. 51), and Administrative Motion to Extend the March 17, 2025, Deadline to File Joint Case Management Statement (ECF No. 61).

/ / /

**BACKGROUND**

Plaintiff Melon buys and sells wholesale quantities of perishable agricultural commodities in both interstate and foreign commerce. Compl. ¶ 2, ECF No. 1. Melon trades in fruit and vegetables that the United States Department of Agriculture recognizes as commodities covered under PACA. *Id.* ¶ 3. Because Melon is engaged, directly or indirectly, in the business of purchasing or selling perishable agricultural commodities in wholesale or jobbing quantities,[1] Melon is a "dealer" as defined by PACA. *Id.* ¶ 4.

Defendant Silo provides "technology solutions for the food supply chain" by supplying "products and services to businesses in the produce and agriculture industries to meet their capital needs" through a Cash Advance Program. Mot. 5. *Id.* Defendant Ashton Braun owns and operates Silo. Compl. ¶ 6. Melon also names several Doe defendants in its Complaint. *Id.*

In its Complaint, Melon asserts fourteen claims against Silo and Braun: (I) Enforcement of the PACA Trust; (II) PACA Violation: Failure to Maintain Trust; (III) Conversion and Unlawful Retention of PACA Trust Assets; (IV) Breach of Trust and Fiduciary Duty of Loyalty by Co-Trustee of the PACA Trust; (V) Operating Without a License: Nev. Rev. Stat. Ann. § 604(A); (VI) Breach of Contract; (VII) Breach of Fiduciary Duty; (VIII) Tortious Interference with Receipt of Trust Assets; (IX) Negligence/Negligence Per Se Statutory Failure to Abide; (X) Fraudulent Concealment/Suppression; (XI) Intentional Interference with Prospective Economic Advantage; (XII) Statutory Recission, Cal. Civ. Code. § 1689 (2024); (XIII) Statutory Recission, Cal. Civ. Code. § 1689 (2024); and (XIV) Injunctive Relief. *See* Compl.

Silo provided commercial lending services to Melon to support Melon's farming project and the growth of its business operations. *Id.* ¶¶ 22-23. Silo, through its commercial lending services, periodically lent Melon money in exchange for Melon's repayment of the loan, plus interest and fees, by and through Melon's produce-related accounts receivable. *Id.* ¶ 24. Silo secured its loans by taking a security interest in Melon's PACA trust assets, or in Melon's produce

---

[1] Under PACA, "wholesale or jobbing quantities" refers to "aggregate quantities of all types of produce totaling one ton (2,000 pounds) or more in weight in any day shipped, received, or contracted to be shipped or received." 7 C.F.R. § 46.2.

1  related accounts receivable and all proceeds related to produce sales. *Id.* ¶ 25.

2        A customer seeking to borrow money from Silo through its "Cash Advance Program" is
3  required to sign and submit a "Cash Advance Program Order Form." Mot. at 5. Starting in
4  January 2024, Melon executed the first of several Cash Advance Program Order Forms with Silo.
5  *Id.* ¶118. Melon also submitted Cash Advance Order Forms on February 7, 2024; February 12,
6  2024; February 13, 2024; March 5, 2024; and May 3, 2024. Butler Decl. at Exhibit 1, ECF No.
7  18-1. Each Cash Advance Order Form includes a bolded "Terms of Service" section that states:

> The Order Form, Customer's use of the Silo Cash Advance program, and receipt of any related services is subject to our Master Service Agreement which is incorporated herein by reference.

*Id.* Underneath this text is the phrase "Master Service Agreement" that links to a document titled "Future Receivables Sale & Merchant Cash Advance Agreement." Butler Decl. ¶ 3. Below the hyperlinked text is the following statement:

> By signing below, the parties hereby agree to all the terms and conditions of this Order and Master Service Agreement.

Butler Decl. at Exhibit 1.

      The Future Receivables Sale & Merchant Cash Advance Agreement ("Cash Advance Agreement") contains a provision titled "Arbitration" that states:

> PLEASE READ THIS PROVISION CAREFULLY. IT PROVIDES THAT ANY DISPUTE SHALL BE RESOLVED BY BINDING ARBITRATION AND THAT (i) SELLER IS GIVING UP ITS RIGHT TO HAVE A TRIAL BY JURY TO RESOLVE ANY DISPUTE ALLEGED AGAINST SILO OR RELATED THIRD PARTIES; (ii) SELLER IS GIVING UP ITS RIGHT TO HAVE A COURT RESOLVE ANY CLAIM ALLEGED AGAINST SILO OR RELATED THIRD PARTIES; (iii) SELLER IS GIVING UP ITS RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, AND/OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT OR ARBITRATION FILED AGAINST SILO OR RELATED THIRD PARTIES.

*Id.* at Exhibit 2. Additionally, section 17.1 of the Cash Advance Agreement states:

> Any Dispute arising from or relating in any way to this Agreement or to the relationship formed between the parties as a result of this Agreement, including Disputes regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved exclusively and finally by binding arbitration administered

3

> by the American Arbitration Association ("AAA"). All Disputes are subject to arbitration, no matter what theory they are based on. This includes Disputes based on contract, tort, agency, statute, regulations, or any other source of law. Seller and Silo shall agree on another arbitration forum if the AAA ceases operations. This arbitration agreement applies to all Disputes now in existence or that may arise in the future. Nothing in this Agreement prevents either party's use of (or advancement of any Disputes, defenses, or offsets in) bankruptcy or repossession, replevin, judicial foreclosure or any other prejudgment or provisional remedy relating to any collateral, security, or other property interests for contractual debts now or hereafter owned by either party to the other.

*Id.* The Cash Advance Agreement, together with each individual Cash Advance Order Form, set out the relevant terms between the parties.[2]

Melon filed the instant action at the beginning of August 2024. Compl. Two months later, Defendants filed a motion to compel arbitration pursuant to the arbitration provision in the Cash Advance Agreement and a motion to stay the case. Mot. at 2. Defendants contend that the arbitration provision in the Cash Advance Agreement encompasses all Melon's claims. *Id.*

Soon after Defendants filed their motion to compel arbitration, the case was reassigned to Judge Beth Labson Freeman. Order Reassigning Case, ECF No. 23. Fordel Marketing, LLC, a trust creditor of Plaintiff, filed a Motion to Intervene on January 10, 2025. Mot. to Intervene, ECF No. 37. Three weeks later, Judge Freeman found the Motion to Compel Arbitration suitable for decision without oral argument and vacated the previously set motion hearing. Order Vacating Hearing, ECF No. 44. On February 24, 2025, the case was reassigned to this Court. Order Reassigning Case, ECF No. 50. Ten days later, and over seven months after filing its initial complaint, Melon filed a Motion for Preliminary Injunction. Mot. for Preliminary Injunction, ECF No. 51. Finally, Silo requested, and Melon did not oppose, an extension to the deadline for the parties to file their joint case management statement. Administrative Motion to Extend the March 17, 2025, Deadline to File Joint Case Management Statement, ECF No. 61.

**LEGAL STANDARD**

The Federal Arbitration Act ("FAA") governs arbitration agreements "evidencing a

---

[2] Melon appears to have executed multiple Cash Advance Order Forms that all incorporate the same Cash Advance Agreement. As such, the Court refers to this course of action as a singular "Cash Advance Agreement."

4

transaction involving commerce." 9 U.S.C. § 2. Such agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* In resolving a motion to compel arbitration under the FAA, a court's inquiry is limited to two "gateway" issues: "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. If both conditions are met, the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms." *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 999 (9th Cir. 2021) (internal quotation marks and citations removed).

"There are two types of validity challenges under § 2: 'One type challenges specifically the validity of the agreement to arbitrate,' and '[t]he other challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.,* the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid.'" *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006)). "Only the first type of challenge is relevant to a court's determination whether the arbitration agreement at issue is enforceable." *Id.* (internal citations omitted). This is "because § 2 states that a 'written provision' 'to settle by arbitration a controversy' is 'valid, irrevocable, and enforceable' *without mention* of the validity of the contract in which it is contained." *Id.* (emphasis in original).

Additionally, gateway issues, including whether a valid agreement to arbitrate exists and whether it encompasses the parties' dispute "can be expressly delegated to the arbitrator where 'the parties clearly and unmistakably provide otherwise.'" *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)) (emphasis omitted). "[C]lear and unmistakable 'evidence' of agreement to arbitrate arbitrability might include ... a course of conduct demonstrating assent ... or ... an express agreement to do so." *Momot v. Mastro*, 652 F.3d 982, 988 (9th Cir. 2011) (citations omitted).

Under the FAA, "arbitration agreements [are] on an equal footing with other contracts," and therefore courts must "enforce them according to their terms." *Rent-A-Center, West, Inc.*, 561 U.S. at 67 (internal citations omitted). A party may petition a court to compel "arbitration [to]

5

1  proceed in the manner provided for in such agreement." 9 U.S.C. § 4. Upon application from a
2  party, a court may stay the action "until such arbitration has been had in accordance with the terms
3  of the agreement." 9 U.S.C. § 3.

## DISCUSSION

Defendants seek to compel arbitration pursuant to the arbitration provision in the Cash Advance Agreement. Mot. at 2. Defendants contend that the arbitration provision in the Cash Advance Agreement encompasses all of Melon's claims. *Id.* Defendants also argue that the provision incorporates the rules of the American Arbitration Association, and that the arbitrator should decide any questions regarding the existence, scope, or validity of the arbitration agreement. *Id.* Finally, Defendants argue that Braun may invoke the arbitration clause as an agent or alternatively, because the claims against him are intertwined with the underlying contractual obligations in the Cash Advance Agreement. *Id.*

Melon appears to concede that the Cash Advance Agreement was formed but asserts that the arbitration provision within the Cash Advance Agreement is unenforceable because the Agreement was made for illegal purposes or is unconscionable, illusory, or void. Opp'n at 1, ECF No. 31. Melon also argues that its claims for a temporary restraining order, injunctive relief, and Silo's alleged PACA trust breach are not arbitrable. *Id.* Additionally, Melon asserts that claims involving PACA assets cannot be arbitrated pursuant to the *Lida* doctrine. *Id.* Finally, Melon argues that Braun cannot invoke the arbitration provision because he is not a party to the Cash Advance Agreement. *Id.*

The Court begins with the gateway issues of whether a valid agreement to arbitrate exists and if so, whether the agreement encompasses the dispute at issue. In so doing, the Court also considers whether the parties expressly delegated these issues to the arbitrator.

### A. Unconscionability and Related Defenses to Enforcement of the Arbitration Provision

First, Melon contends that the Cash Advance Agreement's arbitration provision is unenforceable because the Cash Advance Agreement was made for illegal purposes, is unconscionable, illusory, and void. Opp'n at 3. Melon reiterates its complaint allegations in

support of this argument, stating that the Cash Advance Agreement was "(i) made for the illegal purpose of thwarting PACA; (ii) violative of PACA, including PACA'S trust provisions; (iii) violative of state banking laws; and (iv) unconscionable, one-sided contracts of adhesion that foreclose Melon Corp.'s ability to sue Defendants for any relief whatsoever." *Id.* at 3-4. Citing to its complaint, Melon asserts that the Cash Advance Agreement is unenforceable because it "allowed Silo to, and Silo did, misappropriate PACA funds" and allowed Silo to lend money without a license, thereby violating California and Nevada law. *Id.* Melon further argues that the Cash Advance Agreement is illusory and void for lack of mutuality of consideration. *Id.* at 5. Melon cites its complaint in support stating that the limitation on liability provision in the Cash Advance Agreement "relieves Silo of any liability, risk, or obligation." *Id.* Melon also argues that the Cash Advance Agreement is a contract of adhesion and thus substantively unconscionable. *Id.* at 6-7.

Melon's arguments lack merit. "[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Buckeye Check Cashing, Inc.*, 546 U.S. at 445-46; *see also Prima Paint v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967) (where fraud does not go to the arbitration clause itself, the arbitration clause is enforceable and the arbitrator resolves a claim of fraudulent inducement of contract). Here, even if the complaint alleges that Cash Advance Agreement was made for illegal purposes, is unconscionable, illusory, or void, Melon does not allege any illegality or unconscionability specific to the arbitration provision in these arguments. Barring a challenge to the formation of a contract or a challenge to the arbitration provision itself, the Cash Advance Agreement's arbitration provision is enforceable.

**B.    Illegality of the Arbitration Provision as a Defense to Enforcement**

In the alternative, Melon argues that the Cash Advance Agreement's arbitration provision violates PACA and is thus illegal. Opp'n at 4. Melon contends the provision eliminates its "ability to fulfill its legal duties as a PACA trustee." *Id.* Melon appears to base this contention on the waivers in the arbitration provision that prohibit Melon from "serv[ing] as representative" or "in a representative capacity . . . in any lawsuit or arbitration filed against Silo or related parties."

7

1   *Id.* Melon also appears to interpret the Cash Advance Agreement as barring recovery pursuant to
2   its limitation of liability clause, stating that "if a claim is subject to arbitration under the
3   agreements, then it is also barred from recovery." *Id.* Melon then asserts that, in its legal capacity
4   as a PACA trustee, it is obligated to represent the PACA trust on behalf of itself and PACA
5   beneficiaries. *Id.*

6       Melon's argument fails on two grounds. First, Melon has not met its burden to show that
7   the arbitration provision is illegal. "[T]he party resisting arbitration bears the burden of proving
8   that Congress intended to preclude arbitration of the statutory claims at issue . . . ." *Green Tree*
9   *Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 81 (2000). Melon cites no authority demonstrating
10  that Congress intended to preclude arbitration of PACA claims.

11      Melon does not identify an illegality with the arbitration provision but instead relies on the
12  waivers within the provision, specifically the portion that indicates "Seller is giving up its right to
13  serve as a representative, . . . or in any other representative capacity, and/or to participate as a
14  member of a class of claimants." Butler Decl., Exhibit 2. However, class action waivers are
15  permissible. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 352 (2011). Nor does Melon cite
16  authority that indicates such waivers are contrary to its statutory rights under PACA or any other
17  statutes, or that waiving the right to bring class actions or representative lawsuits otherwise
18  renders the arbitration provision itself invalid, void, illegal, or unenforceable. *See Fresh Express*
19  *Inc. v. Sardilli Produce & Dairy Co.,* No. 3:09 CV 1420 SRU, 2010 WL 3724543, at *5 (D. Conn.
20  Sept. 15, 2010) (finding party opposing arbitration provided no basis to support its conclusory
21  propositions that arbitration would fail to provide a forum in which PACA rights can be
22  vindicated). Thus, Melon has failed to demonstrate how the arbitration provision violates the law
23  or renders the provision invalid or unenforceable.

24      Second, this argument fundamentally relates not to the arbitration provision separately, but
25  to the validity of the Cash Advance Agreement as a whole, including its Limitation of Liability
26  provision. As with Melon's other challenges to the Cash Advance Agreement, the issue of
27  contract validity must first be considered by the arbitrator. *Buckeye Check Cashing, Inc.*, 546,
28  U.S. at 445-46.

**C.      Defense that Claims for Breach of the PACA Trust are Not Arbitrable**

Next Melon argues that its claims brought as a PACA trustee are not arbitrable. Opp'n at 7. Melon asserts that because it signed the Cash Advance Agreement in its individual corporate capacity, it cannot arbitrate claims brought in a different capacity. *Id.* Defendant contends that, per the Cash Advance Agreement's delegation clause, the parties agreed to arbitrate such issues. Reply at 8, ECF No. 35.

Parties to an arbitration agreement "can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, W., Inc.*, 561 U.S. at 68–69. "[W]hether the court or the arbitrator decides arbitrability is 'an issue for judicial determination unless the parties clearly and unmistakably provide otherwise.'" *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1072 (9th Cir. 2013) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)) (emphasis omitted). The Supreme Court has clarified:

> When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless.

*Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019).

The arbitration provision in this case states that "[a]ny Dispute arising from or relating in any way to this Agreement or to the relationship formed between the parties as a result of this Agreement, **including Disputes regarding the applicability of this arbitration clause** or the validity of the entire Agreement, shall be resolved exclusively and finally by binding arbitration administered by the American Arbitration Association ("AAA")." Butler Decl. at Exhibit 2 (emphasis added). This language unequivocally delegates arbitrability questions to an arbitrator rather than the court.

The AAA Commercial Arbitration Rules, in turn, further provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or

counterclaim." *See* AAA Commercial Arbitration Rules and Mediation Procedures R-7(a).[3] Thus, even if the specific language in the arbitration agreement were somehow insufficient evidence on its own, the agreement also incorporates the AAA Commercial Rules. *Id.* The Ninth Circuit has held that "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability."[4] *See Brennan*, 796 F.3d at 1130. The Court finds that the parties' arbitration agreement expressly delegates questions of the arbitrability of any dispute and the enforceability of the arbitration agreement to the arbitrator.

### D. Defense that Requests for Injunctive Relief and Claims Relating to PACA Procedure are Not Arbitrable

Melon also argues that its requests for injunctive relief and relief under PACA claims procedure, are not arbitrable. Opp'n at 10. Melon asserts that this relief is not arbitrable because the arbitrator lacks consent from PACA beneficiaries and the power to administer trust assets. *Id.* Melon also contends that the arbitration provision allows a federal court to provide "prejudgment or provisional" remedies. *Id.*

Melon's arguments lack merit. At their core, Melon's assertions relate to the scope of the arbitration provision. *Id.* Per the arbitration provision in the Cash Advance Agreement, this is an issue for the arbitrator to decide. *See* Butler Decl. at Exhibit 2 (stating "[a]ny Dispute . . . including Disputes regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved exclusively and finally by binding arbitration").

### E. Defense that the *Lida* Doctrine Prohibits Arbitration

Melon asserts that the *Lida* doctrine (or prior exclusive jurisdiction doctrine) precludes arbitration of its claims involving PACA assets. Opp'n at 10. Melon reasons that because it filed the instant lawsuit first, this Court is the only tribunal that can exercise subject matter jurisdiction

---

[3] *See* American Arbitration Association, http://www.adr.org/sites/default/files/CommercialRules_Web.pdf (last visited Mar. 25, 2025).
[4] Although the Ninth Circuit in *Brennan* left open the question of whether its holding only applies to sophisticated parties and commercial contracts, it noted that "the vast majority of the circuits that hold that incorporation of the AAA rules constitutes clear and unmistakable evidence of the parties' intent do so without explicitly limiting that holding to sophisticated parties or to commercial contracts." *Brennan*, 796 F.3d at 1130–31. Regardless, Melon entered into a business agreement with Silo and Melon does not argue that it was unsophisticated.

10

over its claims involving *in rem* and *quasi in rem* jurisdiction of the PACA trust assets. *Id.* In short, Melon argues that an arbitrator lacks subject matter jurisdiction, and this matter should not be compelled to arbitration. *Id.*

Whether the arbitrator lacks subject matter jurisdiction is an issue for the arbitrator to address. Per the arbitration provision in the Cash Advance Agreement, only the arbitrator can decide issues of applicability. *See* Butler Decl. at Exhibit 2 (stating "[a]ny Dispute . . . including Disputes regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved exclusively and finally by binding arbitration"). Should the arbitrator decide it lacks subject matter jurisdiction over the claims, then the parties will return to this Court for the adjudication of their claims.

### F.     Defendant Braun's Ability to Compel Arbitration

Finally, the parties dispute whether Defendant Braun, as a non-signatory to the Cash Advance Agreement, can invoke the arbitration provision to compel Melon to arbitrate its claims against him. Mot. at 12-14; Opp'n at 11-12. Defendants contend that Braun can enforce the Cash Advance Agreement as an agent of signatory Silo or alternatively, under the doctrine of equitable estoppel. Mot. at 12. Melon argues only that Braun cannot compel arbitration under the doctrine of equitable estoppel because Melon "claims no contractual benefit." Opp'n at 12.

 "[A]gents of a signatory can compel the other signatory to arbitrate so long as (1) the wrongful acts of the agents for which they are sued relate to their behavior as agents or in their capacities as agents (*Letizia*) and (2) the claims against the agents arise out of or relate to the contract containing the arbitration clause (*Britton*) (consistent with the language of the arbitration clause)." *Amisil Holdings Ltd.*, 622 F. Supp. 2d at 832 (citing and discussing *Letizia v. Prudential Bache Secs., Inc.*, 802 F.2d 1185 (9th Cir. 1986), and *Britton v. Co-op Banking Group*, 4 F.3d 742 (9th Cir. 1993)).

Here, Braun is an agent of Silo, a signatory to the Cash Advance Agreement. Melon's complaint repeatedly refers to Braun as a principal of Silo. Compl. ¶ 6 (stating that Silo is owned and operated by Braun, identifying Braun as the sole "Reported Principal" of Silo on Silo's PACA license, and noting Braun was in a position to exercise dominion and control over Silo). Melon's

11

claims against Braun relate to his behavior as an agent of Silo. *See id.* Indeed, Melon alleges "Silo acted or failed to act by and through Principal [Braun]." *Id.* ¶ 9.

In addition, Plaintiff's claims against Braun relate to the Cash Advance Agreement, consistent with the language of the Agreement's arbitration provision. The Cash Advance Agreement requires arbitration of "[a]ny Dispute arising from or relating in any way to this Agreement or to the relationship formed between the parties as a result of this Agreement." Butler Decl. at Exhibit 2. Melon's claims are connected to the Cash Advance Agreement because Melon alleges that Silo improperly controlled Melon's cash flow by operation of the Cash Advance Agreement at the direction, authorization, and approval of Braun. Compl. ¶¶ 79, 113-114, 269-288. Accordingly, the Court concludes that under agency principles, because Melon alleges claims against Braun based on the actions Braun took on behalf of Silo, those claims should be arbitrated.

## CONCLUSION

The Court GRANTS Defendants' motion to compel arbitration and ORDERS Melon Corp., Silo Technologies, Inc., and Ashton Braun to engage in arbitration pursuant to the arbitration agreement. The case is STAYED pending arbitration. The Court DENIES the other pending motions as MOOT.

**IT IS SO ORDERED.**

Dated: March 28, 2025

Noël Wise
United States District Judge